Salvador Thomas TUSA, Individually, and on behalf of his minor child, Amanda Elizabeth Tusa, Plaintiff-Appellant,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant-Appellee.

No. 86–3721.

United States Court of Appeals, Fifth Circuit.

Aug. 25, 1987.

Rehearing and Rehearing En Banc Denied Sept. 25, 1987.

---

* District Judge of the Eastern District of Michigan, sitting by designation.

Middleberg & Riddle, Paul J. Mirabile, Metairie, La., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Raymond J. Salassi, Jr., Susan M. Weidner, New Orleans, La., for defendant-appellee.

Before CLARK, Chief Judge, POLITZ, and HIGGINBOTHAM, Circuit Judges.

POLITZ, Circuit Judge:

In this Louisiana diversity jurisdiction case we review a summary judgment allowing an insurer to increase the premium and adjust the deductible of a guaranteed renewable health benefits policy, after notice of a physical condition necessitating present and future medical care for one of the insureds. Concluding that the trial court erred in its application of Louisiana law, we affirm in part, reverse in part, and remand.

*Background*

The relevant facts are not in dispute. In 1973 Prudential Insurance Company marketed a comprehensive major medical policy called the Coordinated Health and Insurance Program. The affinity for acronyms led to its designation as the CHIP policy. In 1976 Salvador Thomas Tusa obtained CHIP coverage for his entire family. The initial policy cost for all family members was $76.70 per month and the policy carried a uniform deductible of $100.00. By virtue of La.R.S. 22:214.1, this policy carried "guaranteed renewable" status.

In March of 1982 Amanda Elizabeth Tusa was born, striken with multiple congenital abnormalities, occasioning the need for a lifetime of extensive medical care.

At the time of Amanda's birth, the CHIP policy then in effect for the Tusa family had a $300.00 deductible. The premium cost assigned to coverage for the children of the family was $67.24 per month. Tusa had the option of purchasing a CHIP policy with a $100 deductible which required a total premium of $216.72 per month for all family members, but opted for the $300 deductible policy requiring a premium of $184.96. Since inception of the policy, Prudential had annually increased the premium for each family member on all CHIP policies.[1]

At the time of this action, Tusa was paying annual premiums totaling $4,954 for a policy with a $5,000 deductible.

These premium increases were based on Prudential's nationwide loss experience with the CHIP policy, and were made for all policyholders within predetermined geographic areas. Based partly on a greater than expected rise in the cost of offering CHIP policies, Prudential stopped marketing this insurance product to new customers. This combination of loss-based pricing and a closed group of customers virtually guaranteed that the premiums for the remaining CHIP policyholders would continue to rise. Because only those with substantial continuing claims or high health risks were motivated to countenance the ever-increasing premiums, a continual worsening of loss-ratios was assured.

1. The monthly premium history for CHIP policies in the Tusas' group was broken down as follows:

| Year | Insured | Spouse | Deductible | Children | Total |
|------|---------|--------|-----------|----------|-------|
| 1976 | Age 24 $19.84 | Age 23 $27.56 | $100.00 | $29.30 | $ 76.70 |
| 1977 | Age 25 $22.25 + $4.00 fee | Age 24 $30.91 | $100.00 | $32.86 | $ 90.02 |
| 1978 | Age 26 $26.26 + $4.00 fee | Age 25 $37.50 | $100.00 | $42.08 | $109.84 |
| 1979 | Age 27 $27.66 + $5.00 fee | Age 26 $41.45 | $100.00 | $45.68 | $119.79 |
| 1980 | Age 28 $35.67 + $5.00 fee | Age 27 $52.25 | $100.00 | $56.52 | $149.44 |
| 1981 | Age 29 $44.71 + $5.00 fee | Age 28 $68.01 | $300.00 | $67.24 | $184.96 |
| 1981 | Age 29 $52.60 + $5.00 fee | Age 28 $80.01 | $100.00 | $79.11 | $216.72 |
| 1982 | Age 30 $68.28 + $5.00 fee | Age 29 $102.11 | $300.00 | $93.34 | $268.73 |
| 1982 | Age 30 $80.33 + $5.00 fee | Age 29 $120.14 | $100.00 | $109.81 | $315.28 |
| 1983 | Age 31 $118.84 + $5.00 fee | Age 30 $181.74 | $300.00 | $157.37 | $462.95 |
| 1983 | Age 31 $139.82 + $5.00 fee | Age 30 $213.81 | $100.00 | $185.14 | $543.77 |
| 1984 | Age 32 $118.52 + $5.00 fee | Age 31 $183.53 | $1,000.00 | $152.13 | $459.18 |
| 1984 | Age 32 $169.31 + $5.00 fee | Age 31 $262.18 | $100.00 | $217.32 | $653.81 |
| 1985 | Age 33 $105.39 + $5.00 fee | Age 32 $164.41 | $1,000.00 | $131.66 | $406.46 |
| 1985 | Age 33 $224.24 + $5.00 fee | Age 32 $349.50 | $100.00 | $280.12 | $859.16 |
| 1986 | Age 34 $108.06 + $5.00 fee | Age 33 $168.08 | $5,000.00 | $131.66 | $412.80 |
| 1986 | Age 34 $229.92 + $5.00 fee | Age 33 $357.62 | $100.00 | $280.12 | $871.76 |

Unable to secure full coverage for Amanda from any other insurer, or even from Prudential except by continuing the existing guaranteed renewable CHIP policy, Tusa accepted the $5,000 deductible with reduced premiums rather than abandoning coverage. He then filed a state court suit seeking a judgment declaring his entitlement to the existing CHIP policy as to Amanda, as it existed at the time of her birth, with a deductible of $300.00 and an overall monthly premium of $184.96, or such lesser sum as the court deemed appropriate. Tusa further sought a declaration that Prudential could not terminate the policy, either directly or constructively.

Prudential removed to federal court on diversity of citizenship, and both parties sought summary judgment. The trial court denied Prudential's motion and partially granted Tusa's, declaring that Prudential may neither directly cancel coverage for the future treatment of Amanda's congenital abnormalities, nor may it constructively terminate the insurance contract by unreasonably increasing premiums. The court declined to conform the terms of the contract to those that existed at Amanda's birth. Tusa appealed the refusal to conform the contract. There was no cross-appeal. The only issue presented, therefore, is whether Tusa is entitled to the premium level in effect when Amanda's physical infirmities came into being.

### Analysis

■ As an Erie court, we sit as a Louisiana court. As such, we find dispositive the opinions in *Cataldie v. Louisiana Health Service & Indem. Co.*, 433 So.2d 367 (La. App.1983), *aff'd*, 456 So.2d 1373 (1984), and *Cabibi v. Louisiana Health Service & Indem. Co.*, 465 So.2d 56 (La.App.1985). Those decisions require that we reverse and remand.

In *Cataldie*, the insurer dramatically increased premiums and reduced coverage after a young insured was diagnosed as suffering from brain cancer. The policy-

holder had declined the guaranteed renewable option. Applying La. R.S.22:213(B)(7), the Supreme Court of Louisiana held that cancellation of the policy could not extinguish the insurer's legal obligation to provide coverage for the existing condition. ·

La.R.S. 22:213(B)(7), as it read at the time of the *Cataldie* and *Cabibi* decisions, as well as all pertinent times herein,[2] permitted the cancellation of a policy which was not guaranteed renewable, by either the insurer or the insured, provided that the "cancellation shall be without prejudice to any claim originating prior thereto." The Supreme Court of Louisiana interpreted this language to apply not only to claims for medical services actually rendered, but to services contemplated because of a known medical need. That court declared:

> [T]he Blue Cross cancellation clause is amended by law and understood to provide that if any member is incurring major medical expenses for an injury when the policy and endorsement are terminated, coverage for that condition shall not be prejudiced by cancellation....
>
> ....
>
> Perhaps in a narrow sense of esoteric legal doctrine Cataldie's claim originating before cancellation could be said to be restricted to medical bills rendered on or before this date. We do not believe the statute should be given such a confined interpretation. The words of a law are generally to be understood in their most usual signification, attending mostly to the general and popular use of words. La.C.C. art. 14. In this sense, in the popular use and usual meaning of words, Cataldie had a claim for major medical services related to his daughter's cancer of which the insurer was notified and which originated before it cancelled the policy.
>
> ....
>
> [O]ur application of La.R.S. 22:213(B)(7) to the insurance contract does not make

---

2. Prudential argues that we should apply the statute as amended in 1985. We decline to do so. The specific issue posed in this pre–1985 guaranteed renewable contract is controlled by the language of La.R.S. 22:213(B)(7) in effect when the policy was first issued.

Cataldie's policy uncancellable for any purpose other than to prevent prejudice to a claim which originated before cancellation....

*Cataldie,* 456 So.2d at 1375–77.

Under this clear holding by Louisiana's highest court it is manifest that prior to its amendment in 1985, La.R.S. 22:213(B)(7) obligated an insurer to provide benefits for a medical condition that had its inception during the policy period without prejudice to coverage of that condition. We therefore agree with the district court's ruling that Prudential may not cancel coverage with respect to the future treatment of Amanda Tusa's congenital abnormalities, either directly or constructively by exorbitant premium increases, for such action would surely constitute the "prejudice" proscribed by Louisiana law.[3]

3. Louisiana authorities vary on the issue whether an insured's claim for medical expenses vests upon the occurrence of the condition requiring medical treatment. The lower court in *Cataldie* concluded that it did. *Cataldie v. Louisiana Health Service and Indemnity Co.,* 433 So.2d 367 (La.App.1983), *aff'd,* 456 So.2d 1373 (1984). *See also Peters v. Life General Security Ins. Co.,* 400 So.2d 1103 (La.App.) *writ denied,* 403 So.2d 70 (1981) (despite policy provision allowing termination upon failure to pay premiums, insured was entitled to full benefits for illness that occurred prior to cessation of benefits); *Wharton v. Louisiana Hospital Service, Inc.,* 183 So.2d 133, 136–37 (La.App.), *writ denied,* 249 La. 62, 184 So.2d 734 (1966) ("upon maturity of the insured's claim while the contract is in force, public policy demands that the vested right of the insured to uninterrupted receipt of benefit be unaffected by subsequent termination....").

The Louisiana Supreme Court affirmed *Cataldie* on the basis of La.R.S. 22:213(B)(7), and did not address the vesting question. Although the statute clearly reflects an intent to protect an insured's rights against cancellation, the court ordered the policy continued, but envisioned further payment of premiums. *Cataldie,* 456 So.2d 1373 (La.1984). If the benefits had truly vested, it would appear that no further premiums would be required to secure them.

Two of Louisiana's intermediate appellate courts have recognized a vested right to benefits after onset of a covered condition, notwithstanding contrary policy terms. *E.g., Valladares v. Monarch Ins. Co.,* 282 So.2d 569 (La.App.), *writ denied,* 284 So.2d 604 (1973) (despite one-year post-accident payment limit, where injury manifests itself, physician recommends course of treatment, and insurer is notified, all within one year, and where treatment cannot successfully be completed within one year, insurer held liable for payments); *Fishman v. Howard,* 447 So.2d 513 (La.App.1984) (same); *Humphries v. Puritan Life Ins. Co.,* 311 So.2d 534 (La.App. 1975) (same). *See also* W. McKenzie & H. Johnson, Insurance Law and Practice, § 285 at p. 531–32, in 15 Louisiana Civil Law Treatise (1986).

In other cases, the Louisiana courts of appeal have enforced policy provisions limiting payments to services performed within a set period of time. *E.g., LeBlanc v. Travelers Insurance Co.,* 486 So.2d 828 (La.App.1986) (no coverage under group hospital policy despite fact that diagnosis of illness, recommendation of surgery, and notice to insurer were all made during period of coverage); *Levine v. National Life and Accident Ins. Co.,* 389 So.2d 864 (La.App.1980) (group medical policy terminated after onset of cancer, insurer was not obligated to pay benefits after termination); *Matherne v. The Prudential Ins. Co.,* 362 So.2d 823 (La.App.1978) (illness manifested itself prior to termination of employment and while group policy coverage was in effect but coverage was denied); *Pierrotti v. Life Ins. Co. of the Southwest,* 295 So.2d 826 (La.App.), *writ denied,* 299 So.2d 790 (1974), (insured entitled to major medical benefits only for one year from date of accident); *Cormack v. Prudential Ins. Co. of America,* 259 So.2d 340 (La.App.), *writ denied,* 261 La. 824, 261 So.2d 230 (1972) (no coverage under accident policy where treatment occurred after six months from date of accident even though services were necessitated by the accident and delay was mandated by impossibility of treatment until other injuries healed).

Other Louisiana cases infer vested benefits, but rely on the policy language. *See Boudreaux v. Fireman's Fund Ins. Co.,* 654 F.2d 447 (5th Cir.1981) (construing language of insurance contract); *Militello v. Bankers Life & Casualty Co.,* 141 So.2d 454, 457 (La.App.1962) ("As the disability arose while the policy was in effect the subsequent cancellation could not affect a claim which had already arisen."). *Dossey v. Life & Casualty Ins. Co. of Tennessee,* 177 So. 427 (La.App.1937) (under policy, where claim had been filed, subsequent notice of cancellation deemed ineffective).

We are inclined to the view that a right to benefits vests when a covered condition occurs while the individual is insured. This is more consistent with the risk that is insured. *See Cataldie,* 456 So.2d at 1376; *Myers v. Kitsap Physicians Service,* 78 Wash.2d 286, 474 P.2d 109 (1970) (en banc) (*quoting* Annotation, *Accident Policy-Termination-Effect,* 75 A.L.R.2d 876 (1961)) ("the better view, which is supported not only by the more closely reasoned cases but which also conforms to what may be described as the general understanding as to the coverage of accident policies, is the one which extends the liability of the insurer to subsequent medical expenses."). *See also* J. Appleman, Insurance Law and Practice, § 706.25 (1981). These authorities would require continual benefits to

We disagree, however, with the district court's ruling respecting the premiums charged to Tusa for Amanda's coverage. Because Prudential may not prejudice coverage for Amanda's congenital condition, we conclude that Tusa is entitled to a declaratory judgment limiting the premiums charged for Amanda's protection to the amount charged for her coverage at the time her condition was diagnosed.

Prudential raised the monthly premiums it charged for the coverage of children under a $300.00 deductible policy every year after Amanda's birth and raised the optional deductible to $5,000. The trial court considered this increase reasonable while disavowing its ability to act as an untutored actuary. We do not agree that Louisiana law requires even this limited actuarial effort in the case at bar. *Cataldie* interpreted the language of La.R.S. 22:213(B)(7), as it read at the time of Amanda Tusa's birth, to mean that if any member of an insured family is incurring major medical expenses when a policy is terminated, coverage for that condition shall not be prejudiced by termination. That leaves for our determination only the question of what constitutes prejudice to a matured claim such as that possessed by Amanda Tusa.

Prudential made a business decision to begin marketing the CHIP policy, and it made a business decision to terminate that marketing effort. When it did the latter, the universe of policyholders necessarily began to constrict, with the certain result that the earnings/loss payable ratio steadily declined.

The decision to terminate new sales of CHIP policies fixes with moral certitude the reality that financially the CHIP policy cannot stand on its own bottom. CHIP policyholders may not be considered a class for calculating changes in premium rates under La.R.S. 22:214(2).

Because the actuarial effect of closing off the CHIP class skews the loss ratio calculations, the only practical method available to this court to avoid prejudice to Amanda Tusa is to fix the premium rate for her continuing coverage at the amount being paid for her coverage at the inception of her claim: the appropriate portion of $67.24 per month for a policy carrying a $300 deductible.

This case involves only Amanda's claims, Amanda's coverage, and Amanda's premiums. This proceeding does not involve any financial adjustments which might be appropriate for the other Tusa family members, and claims they may be entitled to assert. No other family member was alleged to have matured, continuing claims like Amanda. No part of their coverage is affected by our limited holding that Amanda's condition at birth fixed her rights as of that time. The claims of other family members are not affected by today's ruling.

For the foregoing reasons we AFFIRM IN PART, but REVERSE the judgment of the district court which declined to reform the insurance contract, REMANDING with directions to enter a judgment adjusting the indebtedness between the parties in accordance with this opinion.

Amanda for birth-defect-related expenses at no further premium cost.