Sally GAHN, Plaintiff–Appellant,

v.

**ALLSTATE LIFE INSURANCE COMPANY, Defendant–Appellee.**

No. 90–4308.

United States Court of Appeals,
Fifth Circuit.

March 26, 1991.

**1450**

Joseph T. Dalrymple, Rivers, Beck & Dalrymple, Alexandria, La., for plaintiff-appellant.

Robert G. Nida, Gold, Simon, Weems, Bruser, Sharp, Sues & Rundell, Alexandria, La., for defendant-appellee.

Before THORNBERRY, JOHNSON, and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

The appellant, Sally Gahn, was an employee in her husband's business and was covered by a group health insurance policy purchased from the appellee, Allstate Life Insurance Company (Allstate). After she was diagnosed with liver cancer, Allstate increased the premiums and ultimately cancelled the policy. Mrs. Gahn sued Allstate, arguing that the cancellation violated Louisiana law. The district court granted summary judgment in favor of Allstate. Because we find no evidence in the record to support the court's conclusion that the policy was an employee benefit plan, as defined by the Employee Retirement Income Security Act of 1974, or that the insurance contract gave Allstate the right to discontinue Mrs. Gahn's coverage, we REVERSE and REMAND.

## I. FACTS AND PROCEDURAL HISTORY

On October 1, 1986, Homer Gahn, owner of Homer Gahn's Trophies & Gifts, purchased a group health insurance policy from Allstate to cover himself and his employees, who consisted only of his wife, Sally, and their two sons. Allstate provided the insurance through a multiple employer trust, the First Insurance Trust. By naming the multiple employer trust as the policyholder, Allstate was able to provide a group insurance rate for employers like Mr. Gahn with too few employees to qualify for group rates on their own.

Homer Gahn's initial premium under the 1986 policy was $287.57 per month, and the policy provided unlimited coverage for major medical expenses. In October 1987, Sally Gahn was diagnosed with liver cancer. Previously she had suffered from breast cancer, but it was in remission when her husband purchased the policy from Allstate. One year later, October 1, 1988,

Allstate increased the Gahns' premiums to $1,189.50 per month and set a ceiling on major medical coverage at $1 million. Homer Gahn paid the higher premiums.

The provisions of the group policy allowed Allstate to terminate coverage "on any premium due date after the first policy anniversary," provided that the policyholder was notified of the cancellation in writing at least sixty days in advance. *See* Allstate Group Insurance Benefit Booklet (the "Insurance Plan"), Plaintiff's Exhibit 6, at 6. On March 15, 1989, Allstate notified Mr. Gahn that it was cancelling the policy effective October 1, 1989. The cancellation left Mrs. Gahn without any insurance for medical expenses she incurred for treatment of her liver cancer after that date.

On July 11, 1989, Sally Gahn sued Allstate in Louisiana state court to enforce her rights under the policy. She based her right to recover on two theories: first, that the Louisiana Insurance Code prohibited Allstate from discontinuing her coverage after she was diagnosed with a terminal illness; and second, that even if the Insurance Code allowed Allstate to terminate coverage, Louisiana's "abuse of rights doctrine," a civil law concept, prohibited Allstate from exploiting this right. Allstate argued that the group policy was an "employee benefit plan" covered by the Employee Retirement Income Security Act of 1974 (ERISA), codified in 29 U.S.C.A. §§ 1001–1461 (West 1985 & Supp.1990), and removed the case to federal court on the basis of federal question and diversity jurisdiction. There, it maintained that Louisiana law permitted it to terminate Mrs. Gahn's coverage and that her "abuse of rights" theory was preempted by ERISA. Both sides moved for summary judgment.

The district court granted Allstate's motion for summary judgment and dismissed the case. First, the court determined that the group policy was an employee benefit plan and, therefore, that Mrs. Gahn's "abuse of rights" theory was preempted by ERISA. Second, the court held that, under the Louisiana Insurance Code, Allstate was free to cancel Mrs. Gahn's coverage. Al-

though it cited the relevant statute, *see* La.Rev.Stat.Ann. § 22:213(B)(7) note (West Supp.1990) (amended 1989), the court gave no reasons for its interpretation of that law, *see* District Court Ruling at 7, *reprinted in* Record on Appeal at 72, 78. Mrs. Gahn argues that both determinations by the district court were erroneous.

## II. DISCUSSION

### A. *Standard of Review*

We use the same standard that the district court applied to determine whether the evidence supports a summary judgment in Allstate's favor. *See* Fed.R.Civ.P. 56(c); *Morales v. Pan Am. Life Ins. Co.*, 914 F.2d 83, 85 (5th Cir.1990). We can affirm the judgment only if there is no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. *ERISA Preemption*

■ Our first task is to determine whether the district court properly concluded that Mr. Gahn's policy with Allstate was an ERISA plan. Whether an ERISA plan exists is a question of fact. *See Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).

An ERISA plan is any employee welfare benefit plan that is "established or maintained by an employer" engaged in commerce, which "provid[es] for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment...." *See* ERISA, §§ 3(1), 4(a)(1), 29 U.S.C.A. §§ 1002(1), 1003(a)(1) (West 1985 & Supp.1990). Although the benefits of her husband's policy are consistent with the definition of an employee benefit plan, Mrs. Gahn contends that her husband did not "establish" or "maintain" the plan.

Mr. Gahn purchased his group insurance policy from Allstate, which named the First Insurance Trust as the policyholder. In explaining why the policy issued to Homer

Gahn's trophy shop was an employee welfare benefit plan, the district court focussed on the relationship between Allstate and the First Insurance Trust:

> [T]he First Insurance Trust engages in no business except that of being policy holder for a group policy issued to it by Allstate to provide coverage to small employers. Neither the First Insurance Trust nor the trustee can choose an insurer or purchase insurance for any participating employer or employee. All applications for coverage under the policy issued to the trust are made by the employer directly to Allstate. All premiums are billed by Allstate and remitted by the employer directly to Allstate and not to the trustee of the First Insurance Trust. Furthermore, the policy itself indicates the group insurance was purchased to cover employees of the company; the fact that the employees are family members does not change the analysis.

District Court Ruling at 6. The judge relied on *Davis v. Time Ins. Co.*, 698 F.Supp. 1317, 1320 (S.D.Miss.1988), as the model for the findings he needed to make.

■ But the district court misdirected its analysis. Even though the First Insurance Trust was the policyholder, the trust itself was not established or maintained by an employer, and, therefore, is not an employee welfare benefit plan. *See Taggart Corp. v. Life and Health Benefits Admin., Inc.*, 617 F.2d 1208, 1210 (5th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir.1982). Thus, the nexus between Allstate and the trust is only marginally relevant to determining whether Mr. Gahn "established or maintained" an employee benefit plan when he purchased the policy from Allstate. To make that determination, the court should have focussed on the employer, Mr. Gahn, and his involvement with the administration of the plan. *See Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 243 (5th Cir.1990) (analyzing the "employer-employee-plan relationship" to decide whether a corporation had established an ERISA welfare benefit plan); *Taggart*, 617 F.2d at 1211 (noting that ERISA does not regulate the purchase of health insurance if "the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits"); *Foxworth v. Durham Life Ins. Co.*, 745 F.Supp. 1227, 1230 (S.D.Miss.1990).

■ To decide whether an employer has "established or maintained" an employee benefit plan, covered by ERISA, a court in this circuit must conduct two inquiries. First, it must apply the safe-harbor provision that has been prescribed by the Secretary of Labor. *See* 29 C.F.R. § 2510.3–1(j) (1990); *see also* ERISA, § 505, 29 U.S.C.A. § 1135 (West 1985) (authorizing the Secretary to promulgate regulations interpreting ERISA). Under that provision, Mr. Gahn's policy was *not* a statutory employee welfare benefit plan if (1) Mr. Gahn, as an employer, did not contribute to the plan; (2) participation by his family in the plan was voluntary; (3) Mr. Gahn's involvement in the plan was limited to collecting premiums and remitting them to Allstate, and to permitting Allstate to advertise the plan; *and* (4) Mr. Gahn received no profit from administering the plan. *See* 29 C.F.R. §§ 2510.3–1(j)(1)–(4). The group insurance plan must meet all four criteria in order to be exempt from ERISA. *See Memorial Hosp.*, 904 F.2d at 241 n. 6.

If a plan does not qualify for exemption from ERISA coverage under the safe-harbor provision of section 2510.3–1(j), the court must decide whether, " 'from the surrounding circumstances[,] a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.' " *See id.* at 240 (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)). If so, the employer has established or maintained an employee welfare benefit plan that is covered by ERISA.

We cannot decide whether Mr. Gahn's group health plan is an employee welfare benefit plan because the record does not contain the specific findings of fact that we need to apply these two tests. Indeed, the only relevant fact in the record supports

Mrs. Gahn's assertion that the plan was *not* an ERISA plan. Mr. Gahn testified that he did not play any part whatsoever in the formulation of the policy, held no monies in trust, but merely forwarded premium payments to Allstate. He did not own, control, administer nor [sic] assume any responsibility for the policy or its benefits. He merely purchased insurance for his family.

*See* Affidavit of Homer Gahn, Plaintiff's Exhibit 1. Therefore, we must remand this case to the district court so that it can make the factual findings that are necessary to determine whether Mr. Gahn established and maintained an employee welfare benefit plan.

### C. Effect of ERISA Preemption on Sally Gahn's Theories of Recovery

Sally Gahn seeks to recover from Allstate under two theories. First, she asserts that a Louisiana statute prohibited Allstate from cancelling her coverage after she was diagnosed with liver cancer. *See* La.Rev.Stat.Ann. § 22:213(B)(7) note (West Supp.1990) (amended 1989). Second, she argues that, even if the statute permitted Allstate to cancel her coverage, Allstate was precluded from exercising that right under the "abuse of rights" doctrine. The district court held that ERISA preempted Mrs. Gahn's "abuse of rights" theory but that it did not preempt her statutory theory of recovery. If the group policy is an ERISA plan, both rulings were correct. If, on remand, the district court determines that the Gahns' group policy is not an ERISA plan, then Gahns' abusive rights action is not preempted.

ERISA preempts "all State laws insofar as they ... relate to any employee benefit plan." *See* ERISA, § 514(a), 29 U.S.C.A. § 1144(a) (West 1985). The net of section 514(a) is large enough to capture any law that has a connection with such a plan. *See Shaw v. Delta Air Lines*, 463 U.S. 85, 97–98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Under Louisiana law, the "abuse of rights" doctrine is an appropriate vehicle to compel Allstate to pay Sally Gahn's medical benefits. *See Breland v. Louisiana Hosp. Servs., Inc.*, 468

So.2d 1215, 1223–24 (La.Ct.App. 1st Cir. 1984) (on rehearing); *Cataldie v. Louisiana Health Serv. & Indem. Co.*, 456 So.2d 1373, 1376–77 (La.1984). Therefore, the doctrine is within the ambit of section 514(a).

However, in what has come to be known as the "savings clause," Congress stated that ERISA was not intended to supersede State laws which "regulate[ ] insurance." *See* ERISA, § 514(b)(2)(A), 29 U.S.C.A. § 1144(b)(2)(A). The savings clause preserves the right of States, given by the McCarran–Ferguson Act, to regulate the "business of insurance." *See* McCarran–Ferguson Act, § 2(a), 15 U.S.C.A. § 1012(a) (West 1976); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). Consequently, to determine whether a State law is exempt from ERISA preemption, a court should examine the meaning of the phrase "business of insurance" in the McCarran–Ferguson Act. *See Pilot Life*, 481 U.S. at 48, 107 S.Ct. at 1553.

Three criteria are used to decide whether a law regulates the "business of insurance": "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743, 105 S.Ct. 2380, 2391, 85 L.Ed.2d 728 (1985) (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982)) (emphasis in original). Applying these three factors, the Supreme Court has held that an insured could not sue an insurance company under Mississippi's common law of bad faith for wrongfully terminating his coverage under an employee benefit plan. *See Pilot Life*, 481 U.S. at 57, 107 S.Ct. at 1558. The court noted that the Mississippi law did not spread the policyholder's risk, nor was it confined to the insurance industry. *See id.* at 50–51, 107 S.Ct. at 1554–55. "The state common law of bad faith [was] therefore no more 'inte-

gral' to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State." *Id.* at 51, 107 S.Ct. at 1555.

The analysis of *Pilot Life* demonstrates why the "abuse of rights" doctrine is superseded by ERISA. The "abuse of rights" doctrine is a civil law concept that forbids a party from abusing a right given to it by a contract.

> If a party has a legitimate and serious interest in exercising a contractual right, he may do so even if it causes harm to another; however, if a party does not have a legitimate and serious interest in the exercise of the right, and to do so would bring unnecessary harm to another, the doctrine of abuse of rights will bar the exercise of the right.

*Breland,* 468 So.2d at 1223. The doctrine is not confined to the insurance industry but is a law of general application. *Compare Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). Consequently, to the extent that an insured attempts to use the "abuse of rights" doctrine to defeat the contractual right of an insurance company to cancel an employee benefit plan, the doctrine is preempted by ERISA.

■ The district court correctly held, however, that ERISA does not preempt Mrs. Gahn's statutory remedy. Mrs. Gahn contends that a provision of the Louisiana Insurance Code, section 22:213(B)(7), prohibited Allstate from terminating her insurance coverage after she was diagnosed with liver cancer. Section 22:213(B)(7) sets out the conditions that an insurer must meet before it may cancel an insurance policy. The statute meets all three criteria relevant to determining whether a law regulates the "business of insurance": it can transfer the risk of non-coverage from an insured to the insurer; it is "an integral part of the policy relationship between the insurer and the insured"; and it only applies to the insurance industry. Thus, the statute "regulate[s] insurance" and is not superseded by ERISA. *See* ERISA, § 514(b)(2)(A), 29 U.S.C.A. § 1144(b)(2)(A); *Metropolitan Life Ins. Co. v. Massachu-*

*setts,* 471 U.S. at 742–43, 105 S.Ct. at 2390–91 (1985) (noting that "regulation[s] regarding the substantive terms of insurance contracts fall[ ] squarely within the saving clause as laws 'which regulate insurance'"); *Soniat v. Travelers Ins. Co.,* 538 So.2d 210, 215 (La.1989) (holding that ERISA does not preempt section 22:213(B)(7)).

### D. Did Louisiana's Statutory Law Prohibit Allstate from Cancelling Sally Gahn's Policy After She Was Diagnosed with Liver Cancer?

Allstate's duty to provide coverage after cancelling a group insurance policy is entangled in a web of law spun by Louisiana's legislature and its courts over the past decade. Until 1985, only one statute prescribed an insurer's duty following cancellation of a policy.

> Cancellation: The insurer may cancel this policy at any time by written notice delivered to the insured, or mailed to his last address as shown by the records of the insurer, and shall refund the pro rata unearned portion of any premium paid. Such cancellation shall be *without prejudice to any claim originating prior thereto.*

La.Rev.Stat.Ann. § 22:213(B)(7) (West 1959) (emphasis added). Although the Insurance Code indicated that this statute applied only to individual health care policies, *see* La.Rev.Stat.Ann. § 221 (West 1959) (stating that sections 22:212 through 22:214 of the revised statutes "shall not apply to group or blanket health and accident insurance policies"), the Louisiana courts have applied it to group policies as well, *see Soniat,* 538 So.2d at 215–16; *Cabibi v. Louisiana Health Serv. & Indem. Co.,* 465 So.2d 56, 57 (La.Ct.App. 4th Cir. 1985).

In 1984, the Louisiana Supreme Court held that section 22:213(B)(7) prohibited Blue Cross from revoking coverage for an insured's daughter, who had been diagnosed with brain cancer during the policy period. *Cataldie v. Louisiana Health Serv. and Indem. Co.,* 456 So.2d 1373, 1375 (La.1984). Applying the language of the

statute, the court determined that coverage for medical services related to treatment of the cancer was a "claim" which had "originated prior" to the insurer's decision to cancel the policy. *See id.* at 1376. The court noted that this interpretation of the law was consistent with the expectations of the parties: the insured believed that he had bargained for and received coverage for the risk that a catastrophic disease might afflict his family, and Blue Cross should have expected to be exposed to this risk. *See id.* The court also stated that it would be unconscionable to allow an insurance company to wait until a risk had been realized before cancelling a policy, making it impossible for the insured to obtain insurance from any other carrier. *See id.*

In 1985, the legislature amended section 22:213(B)(7) to provide that

> [t]he insurer may cancel this policy at any time by written notice, delivered to the insured, or mailed to his last address as shown by the records of the insurer, and shall refund the pro rata unearned portion of any premium paid. Such cancellation shall be without prejudice to any *claim for benefits accrued* or *expenses incurred* for services rendered prior to cancellation. *Benefits and expenses incurred* shall be defined and limited by the terms of the policy.

La.Rev.Stat.Ann. § 22:213(B)(7) note (West Supp.1990) (emphasis added). The legislature did not state whether the 1985 amendment overruled *Cataldie* by limiting an insurer's obligation to pay medical expenses after cancelling a policy. *See Massachusetts Mut. Life Ins. Co. v. Nails,* 549 So.2d 826, 830, 831 (La.1989).

In 1985, the legislature also added section 22:215(A)(1)(d), a cancellation statute that applied specifically to group insurance policies. The language of that provision was almost identical to the language of section 22:213(B)(7):

> Except as may otherwise be provided in the policy or contract of group health and accident insurance, the policyholder and the insurer may agree to modify, amend, or cancel the group policy, and such agreement shall be binding upon the employee or member insured under the group policy, provided that the modification, amendment, or *cancellation shall be without prejudice to any claim for benefits accrued, or for expenses incurred for services rendered,* prior to such modification, amendment or cancellation. *Benefits and expenses incurred shall be defined and limited by the terms of the policy.*

La.Rev.Stat.Ann. § 22:215(A)(1)(d) note (West Supp.1990) (amended 1989) (emphasis added). The parties did not rely on this statute, nor have they called our attention to it. Absent a contrary indication from the Louisiana legislature or its courts, we will assume that section 22:213(B)(7) still applies to group policies, notwithstanding the addition of section 22:215(A)(1)(d).

In 1989, the legislature amended section 22:213(B)(7) again, this time making it clear that an insurer must continue medical coverage for an insured who has been diagnosed with a terminal illness. *See* La.Rev. Stat.Ann. § 22:213(B)(7) (West Supp.1990). The amended, and current, version of section 22:213(B)(7) states that the insurer's obligations after cancelling a policy are "subject to the provisions of R.S. 22:228." Under section 22:228, if an insurer cancels a group health policy after an insured has been diagnosed with a terminal illness, it must offer the insured a converted policy that will pay for all medical expenses incurred as a direct result of the illness. *See* La.Rev.Stat.Ann. § 22:228(A) (West Supp. 1990). Both statutes became effective on September 3, 1989.

The statute that prescribes Allstate's duty under the policy is the statute that was in effect when the policy was issued. *See Tusa v. Prudential Ins. Co. of Am.,* 825 F.2d 69, 72 n. 2 (5th Cir.1987). Allstate issued the original policy to Mr. Gahn in 1986, indicating that the relevant statute is the 1985 version. But through a complicated interpretation of the policy and events that predated the cancellation of the policy, Mrs. Gahn seeks to invoke the protection of the 1989 amendment. Therefore, we first must decide which of the amend-

ments to section 22:213(B)(7) controls the resolution of this case.

The key to Mrs. Gahn's attempt to use the 1989 amendment is the premise that Allstate issued her husband a new policy on October 1, 1988, when it increased the Gahns' premiums over 500 percent and set a ceiling on major medical coverage at $1 million. As we noted earlier, Allstate was entitled to end the policy one year after it was issued but also was required to notify Mr. Gahn sixty days in advance. Mrs. Gahn asserts that Allstate could give this notification only after the first anniversary date of the policy, which, in effect, would guarantee her coverage for at least fourteen months. Therefore, she contends that Allstate could not cancel the "new" policy until December 1989, and because Allstate cancelled the group policy on October 1, 1989, twelve months after the "new" policy was issued, Mrs. Gahn maintains that she has not yet been cancelled.

■ But the modification of the terms of an insurance policy does not create a new policy under Louisiana law. *See Woodmen of the World Life Ins. Society v. Hymel*, 544 So.2d 664, 667 (La.Ct.App. 3d Cir.), *writ denied*, 551 So.2d 629 (La.1989). Moreover, even if we accept the argument that Allstate issued the Gahns a new policy when it increased the premiums and decreased coverage, that policy was *issued* in 1988 and, therefore, is still controlled by the 1985 amendment.

Having decided that the 1985 amendment to section 22:213(B)(7) defines Allstate's duty to Mrs. Gahn, we now must decide what that duty is. Allstate cannot escape liability for "any claim for benefits accrued or expenses incurred for services rendered prior to cancellation." *See* La.Rev.Stat. Ann. § 22:213(B)(7). Allstate contends that it complied with the requirements of the statute because it paid for all Mrs. Gahn's "expenses" incurred before cancellation. But we reject this argument because it obviates the phrase "benefits accrued." Under Louisiana law, we should not assume that two different terms in a statute are synonymous. *See Colwell v. State*, 506 So.2d 941, 944 (La.Ct.App. 1st Cir.), *writ*

*denied*, 508 So.2d 89 (La.1987); *Spragio v. Board of Trustees of the State Employees Group Benefits Program*, 468 So.2d 1323, 1326 (La.Ct.App. 1st Cir.), *writ denied*, 472 So.2d 32 (La.1985).

Mrs. Gahn, on the other hand, argues that she "incurred" the expense for the treatment of her liver cancer when she was diagnosed with the disease, and she relies on prior interpretations of coverage provisions in insurance policies to support that position. *See, e.g., Valladares v. Monarch Ins. Co.*, 282 So.2d 569, 572–73 (La.Ct.App. 4th Cir.) (holding that cost of plastic surgery to repair scarring was an expense "incurred" within one year of the accident even though the physician waited more than a year after the accident to perform the operation), *writs denied*, 284 So.2d 603, 604 (La.1973); *Humphries v. Puritan Life Ins. Co.*, 311 So.2d 534, 538 (La.Ct.App. 3d Cir.1975) (interpreting a student accident policy and holding that the cost of surgery to repair the student's eardrum, following an accident on school grounds, was an "expense incurred" within ninety days of the accident even though the actual operation did not take place until more than ninety days after the accident); Annotation, *When is Medical Expense "Incurred" under Policy Providing for Payment of Medical Expenses Incurred Within Fixed Period of Time from Date of Injury*, 10 A.L.R.3d 468 (1966). We are not persuaded by this argument either. Even if we were to use prior interpretations of insurance contracts as a guide to interpreting section 22:213(B)(7), a statute, the opinions that Mrs. Gahn cites do not determine when an insurer is permitted to *cancel* a policy; they explain the type of coverage for which the insurer is liable either *while the policy is in effect* or after it has *expired* by its own terms. *See Mezzacappo v. Travelers Ins. Co.*, 523 So.2d 291, 294 (La.Ct.App. 3d Cir.) (stating that there is "a distinct and important difference between 'cancellation' of an insurance contract by the insurer and 'termination' of coverage under a contract of insurance"), *writ denied*, 531 So.2d 473 (1988). Moreover, the cases do not consistently support Mrs. Gahn's argument: depending on the factual context, opinions

are split on whether an insurer must pay for treatment of a disease if the illness arises during the coverage period specified in the contract, but the actual services are rendered after that period. *See, e.g., Matherne v. Prudential Ins. Co.*, 362 So.2d 823, 825 (La.Ct.App. 3d Cir.1978) (holding that the insured, covered by a group insurance policy purchased through his employer, was not entitled to continue receiving coverage for the treatment of his daughter's illness after he terminated his employment); *Tusa*, 825 F.2d at 73 n. 3 (discussing the differing results under Louisiana law).

Section 22:213(B)(7) provides that an insurer may define and limit "[b]enefits and expenses incurred ... by the terms of the policy." Therefore, we should look to the language of the policy to determine whether Allstate defined the benefits that accrued to Mrs. Gahn. *See Waldrip v. Connecticut Nat'l Life Ins. Co.*, 573 So.2d 1172 (La.Ct.App. 5th Cir.1991) (WESTLAW). *Waldrip* was decided under section 22:215(A)(1)(d) rather than section 22:213(B)(7). As we noted above, however, the relevant language in these two statutes is identical. Therefore, the Louisiana appellate court's interpretation of section 22:215(A)(1)(d) is persuasive authority for the proper interpretation of section 22:213(B)(7). *See* C. Wright, A. Miller, & E. Cooper, 19 *Federal Practice and Procedure* § 4507, at 94 (1982) ("If the state's highest court has not ruled on an issue, intermediate appellate court decisions constitute the next best indicia of what state law is.").

In *Waldrip*, the insured developed terminal liver dysfunction while covered under a group health care policy obtained through his law firm. His insurer cancelled the law firm's policy because the coverage was no longer profitable, and it refused to pay for any expenses incurred by the insured that arose after the cancellation of the policy, even though they were related to his liver ailment. The court held that Louisiana law permitted the insurer to define "benefits accrued" and "expenses incurred," but noted that, in this case, the insurer defined only "expenses incurred." Because the insurer had failed to define or limit the term "benefit" in the policy, the court held that " ' 'benefits accrued' under this policy refer[red] to services related to [Waldrip's] liver ailment which arose during the policy term.' " (quoting *Waldrip v. Connecticut Nat'l Life Ins. Co.*, No. 367–865, at 624, 631 (24th La.Dist.Ct. Feb. 14, 1990) (unpublished opinion)).

The legislative history of the 1985 amendment to section 22:213(B)(7) also indicates that an insurer may cancel coverage for an insured without being liable for continuing treatment of an illness that arose during the policy period if the terms of the policy explicitly state that continued coverage for such an illness is not one of the "benefits" of the policy. *See* House Bill No. 1805, Minutes of Meeting of Committee on Commerce, May 29, 1985, Exhibit "C" (statement of Raymond Salassi, attorney for Prudential Insurance Company of America). This interpretation is reinforced by the legislative history of section 22:228, which now prohibits an insurer from discontinuing medical coverage for an insured who has been diagnosed as having a terminal illness. Section 22:228 was enacted to change the law in order to

> limit the cancellation of a group or blanket health insurance policy after a claim for terminal, incapacitating, or debilitating condition has been diagnosed. Representative Adley [who introduced the Bill] stated that he had witnessed what he did not think any citizen of the state should have to go through. A person's health insurance was cancelled when he became terminally ill. The bill would require any insurer who has contracted for coverage to cover an insured who becomes terminally ill and the coverage cannot be cancelled; however, the premiums could be adjusted.

House Bill No. 1122, Minutes of Meeting of House Commerce Committee, May 25, 1989, at 20. This indicates that before section 22:228 was passed, the law permitted an insurer to terminate coverage for a terminally ill patient. *See Singelmann v. Connecticut Nat'l Life Ins. Co.*, No. 88–5554, 1989 WL 145956 (E.D.La. Nov. 28, 1989).

Thus, the 1985 amendment to section 22:213(B)(7) provides that although an in-

surer may not escape liability for "benefits accrued" or "expenses incurred" prior to cancellation, these terms can be "defined and limited by the terms of the policy." *See* La.Rev.Stat.Ann. § 22:213(B)(7). If the insurer does not define the term "benefit," it remains liable for all "services related to a condition of which it was aware before it cancelled the policy." *See Waldrip* at 1174 (quoting *Soniat v. Travelers Ins. Co.*, 538 So.2d 210, 215 (La.1989)). The district court made no factual findings at all regarding the language of the policy, and, therefore, we can uphold the summary judgment only if the terms of the contract clearly permit Allstate to cancel Mrs. Gahn's coverage. Any uncertainty about the meaning of those terms must be resolved in Mrs. Gahn's favor. *See Pareti v. Sentry Indem. Co.*, 536 So.2d 417, 420 (La. 1988).

Unlike the policy at issue in *Waldrip*, the group health policy covering Mrs. Gahn does define the term "benefit" and limits it to payment of a medical expense incurred during the policy period. *See* Insurance Plan, Plaintiff's Exhibit 6, at 12 ("The Medical Benefit is paid for Eligible Expense incurred for an Injury or Sickness while insured."). The policy also states that an "'Expense' is deemed to be incurred on the date the service or supply is furnished." *See id.* at 22. However, the policy provides that Allstate "will pay the Medical Benefit after a person's insurance ends" under certain conditions, one of which is if "the person is Totally Disabled on the day the insurance ends." *See id.* at 15. By definition of the policy, Mrs. Gahn is "Totally Disabled" if she has suffered a "Sickness" that has left her "unable to perform ... the main duties of [her] normal occupation or business; or ... unable to engage in the normal activities, duties, or responsibilities of healthy people of the same age and sex." *See id.* at 25. The expense "must be incurred within 12 months after the day insurance ends." *See id.*

If Mrs. Gahn was "totally disabled," continued payment for her cancer treatment for twelve months was a "benefit" of the policy. The record contains no evidence regarding the proper interpretation of the

term "totally disabled," nor do we have any evidence regarding Mrs. Gahn's condition at the time the policy was cancelled. These questions raise a genuine issue of material fact. Therefore, we reverse the summary judgment that was given in favor of Allstate and remand this issue to the district court so that it can determine whether the terms of the contract gave Allstate the right to cancel Mrs. Gahn's coverage and avoid liability for her continued cancer treatments.

### III. CONCLUSION

The district court considered the wrong factors when it found that the group health insurance contract between Allstate and Homer Gahn was an "employee welfare benefit plan" under ERISA, and the record does not contain the facts we need to make this determination ourselves. The record also does not include facts to support the district court's conclusion that Allstate was free to cancel the insurance contract after Sally Gahn was diagnosed with liver cancer. Under Louisiana law, Allstate could discontinue coverage only if the terms of the policy explicitly gave it that right. On this record, we are unable to say that it did. We REVERSE and REMAND this case so that the district court can re-evaluate these issues in the light of this opinion.