Crawford B. SMITH, Jr., and Jeannie Smith, Plaintiffs–Appellees,

v.

JEFFERSON PILOT LIFE INSURANCE COMPANY, Defendant–Appellant.

No. 92–8934.

United States Court of Appeals, Eleventh Circuit.

Feb. 2, 1994.

Marien C. Kelly, Atlanta, GA, Ray L. Allison, Columbus, GA, for plaintiffs-appellees.

Jerome M. Rothschild, Layfield, Rothschild & Morgan, Columbus, GA, William H. Young, III., Columbus, GA, for defendant-appellant.

Before ANDERSON and CARNES, Circuit Judges, and MERRYDAY *, District Judge.

ANDERSON, Circuit Judge:

Plaintiffs Crawford B. Smith, Jr. and Jeannie Smith brought this suit against Jefferson–Pilot Life Insurance Company in the Superior Court of Muscogee County, Georgia, seeking damages for tortious termination of Jeannie Smith's major medical health coverage. The defendant removed the case to federal court based on diversity. The plaintiffs filed a motion for partial summary judgment contending (1) that the dependent medical coverage provided to Jeannie Smith was not a plan under the Employee Retirement and Income Security Act ("ERISA"), and (2) that even if the coverage were part of an ERISA plan, the state statute underlying their tort claim escapes preemption through application of the ERISA "saving clause", 29 U.S.C. § 1144(b)(2)(A). The district court granted the plaintiffs' motion on both grounds, and this court granted the defendant permission to make an interlocutory appeal of the district court ruling. For the following reasons, we reverse on both grounds, and remand the case to the district court.

## I. FACTS AND PROCEDURAL HISTORY

On August 1, 1981, plaintiff Crawford Smith began his employment with Pilot Life

---

* Honorable Steven D. Merryday, U.S. District Judge for the Middle District of Florida, sitting by designation.

Insurance Company, a predecessor of the defendant, as a commission agent.[1] Smith elected to participate in the insurance plan offered by the defendant to its agents entitled "Group Life and Medical Insurance Plan for Agents and General Agents" (the "Plan"). The Plan was insured through an insurance policy, Group Insurance Policy No. 3469, issued by the defendant, who was both the employer and insurer. All costs of the insurance for agents were paid by the defendant to the Plan. The Plan included a dependent coverage feature whereby eligible dependents of the agents could obtain medical coverage. To obtain dependent coverage, agents were required to make a contribution for the premium. Only agents of the defendant and eligible dependents were able to participate in the Plan. Plaintiff Crawford B. Smith elected to obtain coverage for his wife, Jeannie Smith, through the Plan.

Jeannie Smith suffered a cerebral vascular accident in December of 1981, resulting in ongoing medical costs from that time until her death in June of 1990. The defendant paid these costs pursuant to the dependent coverage feature from 1981 until May 1986. The defendant maintains that the dependent coverage lapsed at that time for nonpayment of the employee contribution. Smith argues that the defendant tortiously terminated the dependent coverage. The termination of this coverage in 1986 forms the basis of this lawsuit.

When Crawford Smith elected to pay for the dependent coverage feature, he authorized Jefferson–Pilot to deduct the premium for his wife's coverage from his compensation account. Crawford Smith's original Request for Group Insurance, dated July 7, 1981, contained the following authorization to deduct a monthly contribution:

> I authorize [Jefferson–Pilot] to deduct the above monthly amount from my monthly compensation. I agree if there are insufficient funds at that time, I must remit my personal check to [Jefferson–Pilot] to continue my coverage. I understand this check must be received by [Jefferson–Pilot] at it's Home Office not later than 30 days after the due date and if not received, all insurance lapses.

The record indicates that Smith's dependent coverage payments had technically been one month in arrears since the second month. This happened because Jefferson–Pilot made no deduction from Smith's compensation account for September 1981, even though Smith's account contained sufficient funds for the deduction.[2] Smith did not send a check to cover the contribution, and he received no request for back payment. The missing deduction from September 1981 did not become an issue until the coverage was terminated in 1986. Following the Jefferson–Pilot error in failing to deduct the September 1981 premium, the monthly premiums were properly deducted from October 1981 until 1986. However, Jefferson–Pilot now argues that each such deduction actually paid the previous month's premium. We refer to this as the long-standing arrearage.

On March 31, 1986, Crawford Smith's compensation account contained insufficient funds to cover the computerized deduction to be made on the next business day. Jefferson–Pilot sent correspondence to Smith dated April 7, 1986, requesting payment of the premium for the dependent coverage by check. Smith purchased a money order on April 16, 1986 and sent it to the defendant, and the payment was credited to Smith's account on April 28, 1986. This date was 27 days after the normal date on which the premium would be paid; thus, it fell within the 30 day grace period established by the terms of the Plan. However, including the long-standing arrearage, the payment was credited to his account 57 days after it was due. Under that calculation the coverage

---

1. The parties do not dispute that the defendant has assumed the obligations of Pilot Life, with whom the defendant merged in 1987, in this matter. For simplicity, this opinion will generally refer to Jefferson–Pilot.

2. There is some confusion in the record whether a deduction was made for September 1981. However, we assume for the purposes of this appeal that Jefferson–Pilot did not make a deduction from the plaintiff's account in September 1981. The record clearly indicates that a deduction was made in August 1981 for the August premium covering the dependent coverage.

had lapsed the very day after the premium would normally have been paid.

Two months later the same thing happened again, as discussed below, but this time the defendant took the position that the policy had lapsed. On May 31, 1986, Smith's compensation account again fell below the amount of the dependent coverage premium. Thus, the account contained insufficient funds on Sunday, June 1, 1986 to cover the deduction made by computer for the dependent coverage premium. The record shows that $90 in commissions were credited to the plaintiff's account on Monday June 2, 1986, which would have covered the required contribution. On June 12, commissions were credited to Smith's account that would have paid another month's premium. By then, however, according to the defendant's position, the coverage had lapsed for failure to make contributions required by the Plan within thirty days of the due date. Jefferson–Pilot's position is that, because of the long-standing one-month arrearage, the May 1 premium was 30 days overdue on June 1, and thus the coverage lapsed when the premium was not paid that day. Jefferson–Pilot states that it notified Smith that his premium had not been paid on June 5 and that Smith did not respond. Therefore, on June 20, 1986, Jefferson–Pilot sent Smith a termination letter. That letter, sent to the plaintiff's office in Macon, Georgia, was intended to notify Smith that his coverage had lapsed for failure to pay the May contribution. Thus, Smith's coverage was terminated either 19 days after the premium was due on June 1, based on the procedures that had been in place since September 1981, or 49 days after it was due under the defendant's argument. Although Smith received statements reflecting the monthly deductions from his account; these statements did not state that the monthly deduction in fact paid the prior month's premium, as defendant now argues. Smith apparently learned of defendant's position for the first time during discovery. Smith's efforts to reinstate the coverage failed. Jefferson–Pilot paid no more benefits to Jeannie Smith for claims under the policy.

On August 10, 1987, Crawford Smith and his wife sued Jefferson–Pilot in state court seeking actual and punitive damages for tortious termination of the dependent coverage. Based on diversity, Jefferson–Pilot removed the case to the United States District Court for the Middle District of Georgia. After extensive discovery, the defendant filed a motion for summary judgment on November 8, 1991, stating that the dependent coverage feature was part of an ERISA plan and that ERISA preempted the state law cause of action. On December 7, 1991, the plaintiff filed a cross motion for partial summary judgment, claiming first that the dependent coverage feature was not an ERISA plan. Alternatively, the plaintiff argued that even if the dependent coverage were part of an ERISA plan, the tort claim escapes preemption through the ERISA "savings clause", 29 U.S.C. § 1144(b)(2)(A), which excepts practices that regulate the business of insurance from preemption. The plaintiff grounded this argument on the theory that the tort claim is based on the defendant's violation of a Georgia statute, O.C.G.A. § 33–24–44(d), which requires written notice of cancellation of insurance coverage. Since the Georgia statute regulates insurance, according to the plaintiff, it is "saved" from preemption, as is the tort cause of action based on its violation. The district court issued an order granting the plaintiff's partial motion on both grounds and denying the defendant's motion on April 20, 1992. On August 19, 1992, the district court certified this order for immediate interlocutory review pursuant to 28 U.S.C. § 1292(b). We granted permission to appeal on September 28, 1992.

## II. STANDARD OF REVIEW

We have plenary review of summary judgments, and we apply the same legal standards that controlled the district court. *Miranda v. B & B Cash Grocery Store*, 975 F.2d 1518, 1532 (11th Cir.1992). We review the facts in the light most favorable to the non-movant and resolve all factual disputes in favor of the non-movant.

## III. DISCUSSION

A. *ERISA Governs the Dependent Coverage Feature.*

Congress enacted ERISA, 29 U.S.C. § 1001 *et seq.*, to protect "the interests of

participants in employee benefit plans and their beneficiaries...." 29 U.S.C. § 1001. ERISA governs "employee benefit plans," Id. at § 1003, and all "employee welfare benefit plans" are also "employee benefit plans." Id. at § 1002(3). ERISA includes in its definition of an "employee welfare benefit plan" any plan "established or maintained for the purpose of providing for its participants or their beneficiaries ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, [or] accident...." 29 U.S.C. § 1002(1)(A).

■ Both case law and Department of Labor regulations have refined the statutory definition of employee welfare benefit plans. There are five prerequisites for an ERISA welfare benefit plan: (1) a plan, fund, or program (2) established or maintained (3) by an employer (4) for the purpose of providing medical benefits (5) to participants or their beneficiaries. *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir.1982). The Jefferson–Pilot Plan and its dependent coverage feature clearly meet these prerequisites. Jefferson–Pilot established the Plan to provide medical benefits exclusively for its agents and participating dependents. Therefore, the coverage in the instant case qualifies as an employee welfare benefit plan under § 1002(1)(A).

The district court, however, agreed with the plaintiff that ERISA did not apply to the dependent coverage provided to Jeannie Smith. Although it did not articulate the specific grounds for its holding, the district court did note in its Memorandum and Order on Motions for Summary Judgment that the dependent coverage was "wholly paid for" by Crawford Smith. The plaintiff argues that regulations 29 C.F.R. § 2510.3–1(e) and (j) remove the dependent coverage from ERISA's reach. These regulations were promulgated by the Department of Labor to clarify the definition of an employee benefit plan under ERISA. 29 C.F.R. § 2510.3–1(a).

■ Regulation 29 C.F.R. § 2510.3–1(e) states:

(e) *Sales to employees.* For purposes of title I of the Act and this chapter, the term "employee welfare benefit plan" and "welfare plan" shall not include the sale by an employer to employees of an employer, whether or not at prevailing market prices, of articles or commodities of the kind which the employer offers for sale in the regular course of business.

The plaintiff argues that § 2510.3–1(e) applies to the instant case because Crawford Smith contributed the entire premium for the dependent coverage, and the coverage provided to Jeannie Smith was identical or substantially similar to the insurance policies that Jefferson–Pilot offered for sale to the public. In other words, they argue that Jefferson–Pilot sold the dependent coverage to the plaintiff. Although interpretation of this regulation is an issue of first impression, it is clear that § 2510.3–1(e) does not apply to the dependent coverage feature contained in the Plan. The plaintiff seeks to sever the dependent coverage feature from the benefits package provided to agents through the Plan. This cannot be done because the dependent coverage was a feature of the Plan, notwithstanding the fact that the cost of such coverage had to be contributed by the employee. The plaintiff offers no case law to support the argument that dependent coverage features may be severed from the rest of an ERISA plan, and common sense compels the conclusion that ERISA regulation is not escaped merely by including such a commonplace feature of group plans.[3] The plain language of the regulation indicates that the regulation contemplates a situation where an individual, who incidentally is an employee of an insurance company, purchases on an individual basis—and not as part of an employee welfare benefit plan—a product from that company. Section 2510.3–1(e) does not apply to situations where an employer-insurer has established an employee benefit plan where

---

**3.** In another context, the Supreme Court refused to exempt a portion of a plan from ERISA that was designed to comply with New York disability laws, even though § 1003(b)(3) exempts plans from ERISA when the plan is solely designed to comply with state disability laws. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 107, 103 S.Ct. 2890, 2905, 77 L.Ed.2d 490 (1983). Thus, we may infer that, generally, ERISA plans may not be severed so that portions of them may be excluded from regulation under ERISA.

both the employee and the employer contribute part of the premium to the plan.[4]

■ Regulation 29 C.F.R. § 2510.3–1(j) also does not apply to the dependent coverage feature. This is a "safe harbor" provision that excludes some programs for group insurance from the "employee welfare benefit plans" governed by ERISA.[5] Again, in relying upon this regulation, the plaintiff seeks to sever the dependent coverage from the rest of the benefits package the Smith's received from the Plan. For the reasons discussed above, we reject Smith's severance argument. We see no indication at all that the regulation was intended to exempt from ERISA coverage the commonplace situation where dependent coverage is paid for by plan participants. The regulation applies only to programs where no contributions are made by an employer; yet under the Plan the defendant contributed all of the premium except for the dependent coverage contribu-

tion. The employer must not subsidize the purchase of insurance for this safe harbor provision to apply. *See Randol v. Mid–West Nat. Life Ins. Co. of Tennessee,* 987 F.2d 1547, 1550 (11th Cir.1993).[6]

For the foregoing reasons, we hold that ERISA governs the dependent coverage feature.

## B. *Preemption*

The "preemption" clause of ERISA provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The ERISA "saving clause", however, "saves" from ERISA preemption "any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). The plaintiff grounds his tort claim on a Georgia statute, O.C.G.A. § 33–24–44(d).[7] Section

---

**4.** Congress expressly contemplated the use of insurance to fund ERISA benefits since it defined covered programs as those funded "through the purchase of insurance or otherwise." 29 U.S.C. § 1002(1). Furthermore, ERISA expressly permits insurer-employers to use their own insurance policies to fund ERISA governed benefits by exempting such transactions from the statute's prohibited transaction provisions. 29 U.S.C. § 1108(b)(5). Thus, Jefferson–Pilot's issuance of its own policy to fund the Plan does not defeat ERISA coverage. The Secretary of Labor has also expressly acknowledged ERISA jurisdiction over plans that deduct employee contributions. 29 C.F.R. § 2510.3–102.

**5.** Regulation 29 C.F.R. § 2510.3–1(j) states in full:

(j) *Certain group or group-type insurance programs.* For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
  (1) No contributions are made by an employer or employee organization;
  (2) Participation [in] the program is completely voluntary for employees or members;
  (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
  (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program,

other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

**6.** The plaintiff attempts to fortify his argument that 29 C.F.R. § 2510.3–1(j) excludes the Plan from ERISA by relying on Opinion Letter No. 83–3A of the Secretary of Labor. This reliance is misplaced. In that opinion the administrator advises a company that 2510.3–1(j) exempts from ERISA the company's policy of selling its standard insurance policies to employees of unrelated subsidiaries. This opinion letter only highlights the distinction between (1) a company that creates a distinct plan for its employees' medical insurance; and (2) a company that allows its employees to purchase individual policies from it or any other insurer. The instant case represents the former scenario, and is not covered by 2510.3–1(j).

**7.** O.C.G.A. § 33–24–44(d) is a notice provision of the Georgia insurance regulations that states in relevant part:

(d) When a policy is canceled for failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums for a policy or any installment of premiums due, whether payable directly to the insurer or indirectly to the agent ... the notice requirements of this Code section may be satisfied by delivering or mailing written notice to the named insured and any lienholder, where applicable, at least ten days prior to the effective date of cancellation in lieu of the number of days' notice otherwise require by this Code section.

33–24–44(d), as applied to the Smith's dependent coverage, falls squarely under the preemption clause since it directly "relates to" an employee benefit plan. Plaintiff argues, however, that the statute regulates insurance, and thus escapes preemption by operation of the ERISA saving clause. The district court agreed. We must determine whether O.C.G.A. § 33–24–44(d) regulates the business of insurance and is saved from preemption as applied to the coverage at issue.

■ Given the broad language of ERISA's preemption clause, and the saving clause's equally broad exception to preemption for laws that regulate insurance, courts have struggled to define which state laws regulate insurance for the purposes of ERISA. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), set forth the analysis for determining whether a state law is an insurance regulation. Subsequently, the Court reaffirmed the use of the *Metropolitan Life* analysis, but did so with a clear intent to create a narrower scope for the saving clause in light of the broad sweep of the preemption provision. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Thus, we apply the test for determining whether a state statute regulates insurance, mindful of ERISA's design to "establish pension plan regulation as exclusively a federal concern." *Pilot Life*, 481 U.S. at 46, 107 S.Ct. at 1552, *quoting Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). First, the state law must regulate insurance within a common-sense view of the word "regulate."

*Pilot Life*, 481 U.S. at 50, 107 S.Ct. at 1554. Second, the state law must regulate the "business of insurance," as that term is defined by cases interpreting the scope of the McCarran–Ferguson Act. *Metropolitan Life*, 471 U.S. at 743, 105 S.Ct. at 2391.[8] The "business of insurance" test outlines three criteria for courts to consider in deciding whether a statute regulates insurance: (1) whether the law has the effect of transferring or spreading a policyholder's risk; (2) whether the law impacts an integral part of the policy relationship between the insurer and the insured; and (3) whether the law is directed only at entities within the insurance industry. *Id.* We have held that ERISA preempts Alabama case law requiring notice of policy cancellation based on this analysis. *Willett v. Blue Cross and Blue Shield of Alabama*, 953 F.2d 1335 (11th Cir.1992).

■ The statute in question clearly regulates insurance within the common-sense portion of the test. It expressly targets the insurance industry. *See Pilot Life*, 481 U.S. at 50, 107 S.Ct. at 1554. Next, we apply the three-pronged "business of insurance" test. Under the first prong of the test, O.C.G.A. § 33–24–44(d) does not have the effect of transferring or spreading a policyholder's risk. The Supreme Court has explained that the risk-spreading principle concerns the nature of the coverage of the policy—in other words, the risks of injury that the insurance company will bear for the insured. *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 130, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982). That transfer is complete at the time the contract is entered. *Id.*[9] O.C.G.A. § 33–

---

The plaintiff claims that Jefferson–Pilot violated this statute by lapsing the dependent coverage without complying with the statute. It would seem to be clear that the defendant did not give notice under the terms of this statute, and this would apparently be one ground on which the termination of coverage might be declared invalid. Another potential ground, wholly independent of the Georgia statute, involves the validity under federal law of Jefferson–Pilot's reliance on the long-standing one month arrearage.

8. Congress enacted the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*, to remove insurance companies from the scope of antitrust laws and to declare that "the continued regulation and taxation of the several States of the business of

insurance is in the public interest." 15 U.S.C. § 1011.

9. Thus, although a statute that prevents cancellation of a policy without notice arguably affects the transfer of risk, since it regulates the conditions under which the insurer must continue to bear risks for the insured, it does not alter the initial apportionment of risk among the parties at the inception of the contract. The first prong of the business of insurance test concerns only laws that impact the original apportionment of risks covered by the policy. The statute before us merely attempts to minimize the risk of noncoverage to persons whose policies lapse. *See Tingle v. Pacific Mut. Ins. Co.*, 996 F.2d 105, 108

24–44(d) does not affect the apportionment of risks, i.e., what medical costs are covered, that the parties made upon entering the contract. This court also held in *Willett,* without comment, that Alabama's notice requirements did not spread risk under this analysis. 953 F.2d at 1341, n. 6.

■ Application of the second prong of the business of insurance analysis provides a closer issue. However, *Willett* held, again without comment, that Alabama's similar notice requirements do not affect an integral part of the relationship between the insurer and the insured. *Id.* Although the contours of the second criterion are somewhat vague, our analysis of its meaning, in light of the purpose of ERISA, leads us to same conclusion as *Willett.*

O.C.G.A. § 33–24–44(d) relates to the administration of benefit plans that include insurance policies. In other words, the kind of notice that is required in order to terminate coverage is a matter that lies at the core of plan administration. ERISA is designed, however, to provide uniformity in the administration of benefit plans for the protection of plan participants. *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987); *Pilot Life,* 481 U.S. at 46, 107 S.Ct. at 1552; *FMC v. Holliday,* 498 U.S. 52, 59–60, 111 S.Ct. 403, 408–409, 112 L.Ed.2d 356 (1990). Moreover, where a state statute has been found to affect an integral part of the relationship, the statute has affected the substantive terms of the contractual relationship. *See FMC v. Holliday,* 498 U.S. at 61, 111 S.Ct. at 409 (holding that a state anti-subrogation statute "directly controls the terms of insurance contracts by invalidating any subrogation provisions that they contain"); *Metropolitan Life Ins. Co. v. Mass.,* 471 U.S. at 743, 105 S.Ct. at 2391 (holding that mandated benefits laws regulate an integral part of the policy relationship "by limiting the type of insurance that an insurer may sell to the policyholder").

The statute in this case regulates the administration of policies, not their substantive terms. As did the *Willett* panel, we conclude that the Georgia statute does not affect an integral part of the relationship between the insurer and the insured.[10]

■ O.C.G.A. § 33–24–44(d) does satisfy the third prong of the business of insurance test, since it is aimed solely at entities within the insurance industry. Thus, the statute satisfies only one of the three criteria for deciding whether it regulates insurance. That is not enough to place the statute within the purview of the business of insurance.[11]

■ The *Pilot Life* opinion indicates a strong preference for preemption of state statutes that concern subjects among the central purposes of ERISA, and indicates that application of the business of insurance test should be informed by the purposes underlying ERISA. 481 U.S. at 51–52, 107 S.Ct. at 1555–1556. One of the core pur-

(5th Cir.1993) (holding that a Louisiana law that false statements made on a policy application must have actual intent to deceive in order for them to bar recovery did not satisfy the first prong, because "[a]lthough the statute does shift the burden of innocent misrepresentations (the legal risk) onto the insurer, it does not spread the risk of insurance (health) coverage for which the parties contracted").

**10.** The plaintiff relies on *Gahn v. Allstate Life Ins. Co.* to support his argument that the statute affects an integral part of the policy relationship. 926 F.2d 1449 (5th Cir.1991). *Gahn* involved a Louisiana statute that is similar to the statute before us, but is distinguishable. The Louisiana statute at issue in *Gahn* required written notice for the cancellation of policies, but it also provided that the cancellation would not prejudice benefits accrued prior to cancellation. *Id.* at 1455. The latter portion of the statute added substance to the relationship between the insurer and the insured because, as *Gahn* held, it forbade insurers from discontinuing the payment of benefits to policyholders stricken with terminal illnesses prior to cancellation of their policy. *Id.* at 1458. Therefore, it mandated the continued payment of benefits after cancellation to certain policyholders. O.C.G.A. § 33–24–44(d) does not affect the terms of coverage. It regulates the procedure for ending the policy relationship, and adds to the administrative requirements that group policies face.

**11.** Some courts have ruled that state statutes failing under the first prong do not satisfy the business of insurance test without even looking to the other criteria. *Tingle v. Pacific Mut. Ins. Co.,* 996 F.2d at 108. We need not address that issue in this case since we readily resolve this case analyzing the statute under all three prongs in light of the core purposes of ERISA.

poses of ERISA is to provide uniformity in the administration of employee benefit plans and avoid subjecting plan administration to varying standards created by differing state laws. *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. at 9, 107 S.Ct. at 2216. Without preemption the Georgia notice provision here and similar statutes and case law in other states would subject the defendant's Plan, which covers agents of the defendant nationwide, to the varying notice standards of all the states. Such a result would directly conflict with ERISA's goal of establishing a uniform set of regulations for employee benefit plans. The Supreme Court has not hesitated "to apply ERISA's preemption clause to state laws that risk subjecting plan administrators to conflicting state regulations." *FMC v. Holliday,* 498 U.S. at 59, 111 S.Ct. at 408.

■ Applying the three-pronged business of insurance test in light of the purposes underlying ERISA, we readily conclude, consistent with the *Willett* panel, that the Georgia notice statute is preempted.[12] Only the third prong of the business of insurance test is satisfied, and that is clearly not sufficient to save the Georgia statute from preemption.

The instant statute relates directly to the administration of insured benefit plans; to permit the saving clause to foreclose preemption would undermine a core purpose of ERISA—providing uniform standards for administration of benefit plans. Accordingly, we hold that the saving clause does not apply to O.C.G.A. § 33–24–44(d), and this case must proceed under ERISA.[13]

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

**REVERSED and REMANDED.**

**12.** We note also that the Plaintiff's tort claim based on O.G.C.A. § 33–24–44(d) would clearly be preempted. The second half of *Pilot Life* added further considerations to the saving clause analysis as it applies to enforcement actions under ERISA plans. 481 U.S. at 52, 107 S.Ct. at 1555. This next level of analysis considers the saving clause in the context of ERISA's civil enforcement scheme set out in § 1132. Section 1132(a) states in relevant part:

> A civil action may be brought—
> (1) by a participant or beneficiary—
> (A) for the relief provided for in subsection (c) of this section, or
> (B) to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan....

The *Pilot Life* court made clear that § 1132 is a comprehensive scheme for enforcement of ERISA plan disputes, adding that "[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." 481 U.S. at 54, 107 S.Ct. at 1556. The claim at issue in *Pilot Life* sought to recover benefits due under the plan pursuant to § 1132(a)(1)(B). The instant

case concerns a claim that the defendant wrongfully lapsed coverage; thus, it involves a suit to enforce the plaintiff's rights under the plan, which is covered under § 1132(a)(1)(B). Therefore, the tort claim would also be preempted. *See also, Ingersoll–Rand v. McClendon,* 498 U.S. 133, 142–145, 111 S.Ct. 478, 484–486, 112 L.Ed.2d 474 (1990).

**13.** Although we express no opinion on the merits of the plaintiff's claims, we note that we have held that courts should review denial of benefit claims under an arbitrary and capricious standard; however, where a conflict of interest exists, that deference diminishes in the manner articulated in *Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556 (11th Cir.1990). In the instant case the plaintiff must pursue remedies through the enforcement scheme of ERISA, and any amended claims filed against the plan or other parties arising out of the termination of coverage and subsequent denial of benefits would relate back to the original complaint for purposes of the statute of limitations under Fed.R.Civ.P. 15(c). *See Davis v. NMU Pension & Welfare Plan,* 810 F.Supp. 532, 537–38 (S.D.N.Y.1992) (retired union member who brought claim against union could amend claim to sue Plan under the relation back principle).