United States Court of Appeals,

Fifth Circuit.

No. 97-20062.

Robert P. WEGNER, Plaintiff-Appellee,

v.

STANDARD INSURANCE COMPANY, Defendant-Appellant.

Dec. 9, 1997.

Appeal from the United States District Court for the Southern District of Texas.

Before REAVLEY, BARKSDALE and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This case, which calls for us to construe the phrase "overtime pay and any other extra compensation" as it appears in a group disability insurance policy, arises from an injury suffered by Robert P. Wegner shortly after he accepted a higher-compensating, out-of-town job assignment from his employer. Standard Insurance Company, the issuer of the policy, contends that Wegner's higher earnings at the time he was injured constitute excluded "overtime" or "any other extra compensation" under the policy, and therefore the proper basis for calculating his disability benefit is his lower pre-assignment rate of compensation. In response to cross-motions for summary judgment, the district court held in favor of Wegner, finding that his higher compensation was not overtime or extra compensation and therefore serves as the proper basis for calculating the disability benefit. In a separate order, the district court also awarded Wegner attorneys' fees. Standard appeals both rulings, and we affirm.

BACKGROUND

On June 29, 1990, Robert P. Wegner ("Wegner") began work as a service technician/fabricator with CRC-Evans Pipeline, Inc. ("CRC-Evans") in Houston at the rate of $10.25 per hour. He received a pay increase to $10.75 per hour soon thereafter. On July 22, 1991, Wegner accepted an assignment to CRC-Evan's "Kern River Project" in Las Vegas. The Employee

Assignment Agreement provided that he was being assigned to the project as a senior operator/technician; he would be paid a salary of $300 per day for working approximately 12 hours per day, 7 days a week; and his assignment would end upon either the successful completion of the project or termination of the project by CRC-Evans or the contractor. A Change Authorization/Employment Authorization form implementing Wegner's change in status from an hourly to a salaried employee qualified the compensation change as being effective for the duration of the assignment only.[1]

On September 4, 1991, while working on a construction site, Wegner fell from a truck and suffered shoulder and elbow injuries. On September 21, 1991, CRC-Evans executed another authorization form, terminating Wegner's assignment to the Kern River project and returning his status to that of an hourly employee paid at the rate of $10.75 per hour. At the time of his injury, Wegner was covered by a long-term disability insurance policy (the "policy") provided by CRC-Evans, as part of an employee welfare benefit plan within the purview of the Employee Retirement Income Security Act of 1974 ("ERISA").[2] Accordingly, Wegner applied for disability benefits pursuant to the policy.[3] Standard Insurance Company ("Standard"), the issuer of the policy, accepted Wegner's disability claim, but the present dispute as to the proper calculation of the benefit amount soon arose.

In the event of a disability, the policy provides coverage for 60% of an employee's "pre-disability earnings," subject to "maximum amount" limits not applicable here. The policy defines "predisability earnings" as follows:

---

[1]The above-mentioned Employee Assignment Agreement, together with the Change Authorization/Employment Authorization form, may hereinafter be referred to as "the relevant employment documents."

[2]The parties agree that the instant long-term disability plan is an employee welfare benefit plan covered by ERISA. *See* 29 U.S.C. § 1002(1); 29 U.S.C. § 1001 *et seq.*

[3]ERISA § 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

PREDISABILITY EARNINGS means your monthly rate of earnings from your EMPLOYER including commissions and deferred compensation, but excluding bonuses, **overtime pay and any other extra compensation.**

(emphasis added). The predisability earnings used to compute the disability benefit is determined as follows:

If you become DISABLED, the ... PREDISABILITY EARNINGS used to compute your LTD BENEFIT will be based on your monthly rate of earnings in effect on your last full day of ACTIVE WORK before you become DISABLED. Any change in the amount of your monthly rate of earnings which is approved or becomes effective after that last full day of ACTIVE WORK will have no effect on the amount of your ... PREDISABILITY EARNINGS used to compute your LTD BENEFIT for that period of DISABILITY.

In determining the amount of disability benefits to be paid to Wegner, Standard based its calculation of Wegner's predisability earnings on the $10.75 per hour rate he was earning prior to his assignment to the Kern River project.

On or about March 14, 1995, Wegner filed suit in Texas state court, asserting that his predisability earnings should be calculated on the basis of his higher $300 per day rate of compensation at Kern River. Standard removed the case to the United States District Court for the Southern District of Texas, Houston Division, and subsequently filed a motion for summary judgment arguing that the $300 per day rate of compensation constituted "overtime" or "any other extra compensation" that was excluded from coverage under the policy. Wegner then filed a counter-motion for summary judgment, arguing that the increased pay did not constitute "overtime" or "any other extra compensation" and therefore was the proper basis on which to calculate predisability earnings. The parties stipulated that if Wegner's interpretation of the policy was adopted, the amount of back benefits payable to him through July 19, 1996 would be $221,846.40; should the court expand the benefits period beyond July 19, 1996, the appropriate rate would be $5,459.58 per month.

On October 31, 1996, the district court ruled in favor of Wegner on the cross-motions for summary judgment; in addition, the district court requested further briefing and production of evidence on whether Wegner was entitled to attorneys' fees. On December 18, 1996, the district court awarded Wegner substantially all the relief he sought regarding attorneys' fees, and entered the

3

final judgment in this case. Standard timely appeals, and this court has jurisdiction of this case pursuant to 28 U.S.C. § 1291.

## DISCUSSION

*Construction of Policy*

We review a district court's grant of summary judgment *de novo. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1451 (5th Cir.1995). Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, we must evaluate the facts in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Todd,* 47 F.3d at 1451.

Moreover, when we are called to interpret an ERISA-covered policy in cases involving the denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B), we construe the terms of the plan *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Todd,* 47 F.3d at 1451; *Harms v. Cavenham Forest Indus.,* 984 F.2d 686, 688 (5th Cir.1993). The record in this case reveals no such grant of discretionary authority to a fiduciary or administrator. As such, the language of the policy will guide our *de novo* interpretation. *Harms,* 984 F.2d at 688.

Federal common law governs this case, including the construction of the policy provisions at the heart of this dispute. *Todd,* 47 F.3d at 1451; *Jones v. Georgia Pacific Corp.,* 90 F.3d 114, 116 (5th Cir.1996). Although we may "draw guidance from analogous state law" in ascertaining the applicable federal common law, *Brandon v. Travelers Ins. Co.,* 18 F.3d 1321, 1325 (5th Cir.1994) (internal quotation omitted), "[w]e must nevertheless bear in mind that, in doing so, we may use [it] ... only to the extent that [it] is not inconsistent with congressional policy concerns." *Todd,* 47 F.3d at 1451 (internal quotation and brackets omitted).

4

In construing ERISA plan provisions, we interpret the contract language "in an ordinary and popular sense as would a person of average intelligence and experience," such that the language is given its generally accepted meaning if there is one. *Todd,* 47 F.3d at 1451 n. 1 (internal quotation omitted); *Jones,* 90 F.3d at 116 (internal quotation omitted). Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured. *Id.*

The primary issue in this case is whether Wegner, at the time of his injury, was earning "overtime" or "any other extra compensation" which was excluded from coverage under the policy.[4] After reviewing the policy, we hold that the terms "overtime" and "any other extra compensation" are not ambiguous, but rather have an ordinary and generally accepted meaning. A person of average intelligence and experience, reading these terms of limitation in the policy, would conclude that Wegner's $300 per day salary at the Kern River project did not constitute overtime or any other extra compensation.

We are unimpressed with Standard's argument that a person working 12 hours a day, 7 days a week must be working overtime. As the district court noted, the concept of "overtime" ordinarily applies only to hourly employees: once the employee exceeds his assigned number of hours, he is paid at a higher hourly rate for the excess.[5] Wegner's $300 per day rate of compensation at Kern River does not fall within the generally accepted meaning of the term overtime. The relevant employment documents implementing Wegner's assignment to Kern River explicitly identify his employment status at the project to be "full-time" (not "part-time" or "temporary") and his new pay status to be "salaried" (not hourly). "[A]dditional compensation for extra hours worked is ... not generally consistent with salaried status." *Abshire v. County of Kern,* 908 F.2d 483, 486 (9th Cir.1990); *see also Banks v. City of N. Little Rock,* 708 F.Supp. 1023, 1024 (E.D.Ark.1988)

---

[4]The terms "overtime" and "any other extra compensation" were not defined in the policy.

[5]In employment contexts, "overtime" means "working time in excess of a minimum total set for a given period ... [;] an additional payment for overtime." *Webster's Third New International Dictionary,* 1611 (1993).

("[p]ayment of a fixed amount plus additional hourly wages for extra hours worked is not consistent with salaried status").[6] Had Wegner's employer, CRC-Evans, meant for his compensation to be overtime, it could have plainly indicated this on the relevant employment documents. Because the facts indicate that CRC-Evans did not consider Wegner to be working overtime when the assignment was made, we see no reason why that determination should be different now.[7]

Our analysis of the term "any other extra compensation" follows much the same path. There is no dispute as to whether Wegner's Kern River salary was "compensation;" as such, our inquiry focuses on whether it was "extra" compensation. In everyday parlance, "extra" generally means "beyond the usual or norm."[8] We conclude that no part of Wegner's salary at Kern River falls within the generally accepted meaning of the term "any other "extra' compensation." The relevant employment documents expressly changed Wegner's status from an hourly employee to a salaried one; they provide that he was due a salary of $300 per day for fulfilling his duties at the project. Under these circumstances, and in the context of Wegner's work assignment, we conclude that the $300 daily rate was his usual and normal compensation at the time of injury, and in no way was it "extra." Wegner contracted to work long hours and to be paid a flat salary for doing so.

Standard claims that our conclusion is belied by the fact that Wegner's assignment to the Kern River project was "temporary." On this basis, Standard contends that Wegner's previous hourly wage of $10.75 continued to be his usual and normal salary, and the increased pay he received at Kern River was "extra compensation" that should not enter into the determination of his predisability

---

[6]The cited cases involve the determination of whether certain employees are exempt from the overtime provisions of the Fair Labor Standards Act ("FLSA"). The parties in this case have made no reference to the FLSA, and we cite it and the related cases for the limited purpose of informing our analysis of the plan terms that are in dispute here.

[7]The plain language of the EMPLOYEE ASSIGNMENT AGREEMENT indicates that Wegner was being paid a salary of $300 per day for working approximately 12 hours per day, 7 days a week. We cannot envision a plausible argument in favor of finding overtime unless Wegner was working over 84 hours a week. No such showing was made in this case.

[8]*Webster's Third New International Dictionary,* 806 (1993), defines "extra" as (1) "beyond or greater than what is due, usual, expected, necessary, or essential;" (2) "to a degree or extent beyond the usual;" or (3) "in excess of a usual, regular, or specified size or amount."

6

earnings. The district court found this view to be reasonable, noting evidence which showed at least part of the reason Wegner received an increased salary was to compensate him for being away from home for long periods and for working long hours.[9] Although the documents initiating the $300 daily rate reflect that the increased pay was to be effective only for the duration of the project, we are not convinced by the record before us that the duration of the project alone qualifies the compensation as merely "temporary." In fact, the word "temporary" is not found on any of the relevant employment documents. Wegner was assigned to the Kern River project for an indefinite time, as shown by the language on the EMPLOYEE ASSIGNMENT AGREEMENT: "The term of assignment shall be for a period of time beginning 22 July 1991 and ending upon successful completion of the project or terminated [sic] by CRC-Evans or the contractor." Moreover, although there was space provided on the Change Authorization/Employment Authorization form to note a change of employment status, CRC-Evans listed Wegner as a "full-time employee" as opposed to a "part-time, temporary or contract" employee. Accordingly, the happenstance of Wegner's being injured less than two months into the assignment, thus causing his compensation to revert back to $10.75 per hour, does not convince us that the $300 daily rate was temporary.[10] Further, even if we were to characterize the pay increase as "temporary," that does not necessarily mean that it was "extra compensation." Nothing in the policy states that a beneficiary's applicable monthly rate of earnings, for purposes of calculating predisability earnings, must be calculated on the basis of non-temporary compensation.

Had Wegner's employer, CRC-Evans, intended an "extra compensation" or "overtime" arrangement for his new job assignment, leaving intact his status as an hourly employee, we are confident that such intent would have been spelled out in the relevant employment documents. Here, these documents sufficiently establish Wegner's status at the time of the assignment as a full-time,

---

[9]The district court also found as reasonable Wegner's interpretation of " any other extra compensation" as possibly denoting benefits, perks, or other compensation unrelated to wages. Confronted with these two "reasonable" interpretations, the court concluded that the term "any other extra compensation" was ambiguous.

[10]Standard has argued that the temporary nature of Wegner's increased compensation was confirmed by CRC-Evans revising his pay to $10.75 per hour seventeen days after his injury.

salaried employee, earning a usual and normal salary of $300 per day. Accordingly, we find that Wegner's rate of earnings on his last day of active work before becoming disabled was roughly $9,000 a month;[11] his predisability earnings should be calculated on that basis.[12]

*Attorneys' Fees*

Standard also argues that the district court erred in awarding attorneys' fees to Wegner. Although the district court rejected Wegner's request to calculate the appropriate amount of fees on the basis of his contingent fee contract with his attorneys, *see Todd,* 47 F.3d at 1459, it did grant him $24,405 after considering his application.[13]

ERISA § 502(g), applicable both to trials and appeals, provides that "the court in its discretion may allow a reasonable attorney's fee and costs ... to either party." 29 U.S.C. § 1132(g)(1); *Sims v. Great-West Life Assur. Co.,* 941 F.2d 368, 373 (5th Cir.1991). We review the district court's decision to award attorneys' fees only for an abuse of discretion. *Todd v. AIG Insur. Co.,* 47 F.3d 1448, 1458 (5th Cir.1995).

---

[11]Depending on the type of compensation earned, the policy places certain conditions and/or limitations on the calculation of an employee's monthly rate of earnings. For "commissions," the monthly rate of earnings includes the average monthly commission received during the preceding 12 months. For "weekly pay," the monthly rate of earnings is calculated by multiplying the weekly earnings by 4.333. For "hourly pay," the monthly rate of earnings is calculated by multiplying the hourly pay rate by the number of hours the employee is regularly scheduled to work per month (subject to a cap of 173 hours). Because the relevant employment documents establish that Wegner was not paid on an hourly, weekly, or commission basis at the assignment, but rather on a daily basis, the calculation of his applicable monthly rate of earnings is not conditioned or limited by these provisions.

[12]As mentioned, the district court found the term "any other extra compensation" to be ambiguous; it then applied the *contra proferentum* rule and construed the term in favor of Wegner, the insured. Accordingly, the district court reached the same conclusion as we do: that Wegner's disability benefit should be calculated on the basis of his $300 per day salary at the time of his injury. Standard argues that the district court incorrectly ignored extrinsic evidence which allegedly resolves the ambiguity in its favor, and therefore applied the *contra proferentum* rule prematurely. In most cases, the question of whether a contract term is ambiguous also presents a question of law subject to plenary review. *Sunbeam-Oster Company, Inc. Group Benefits Plan For Salaried and Non-Bargaining Hourly Employees v. Whitehurst,* 102 F.3d 1368, 1373 (5th Cir.1996). Because we conclude that the term "any other extra compensation" is not ambiguous, we do not reach this issue.

[13]The district court also awarded Wegner $6,430.32 in costs. Standard has not appealed this ruling.

8

Although the decision to award attorneys' fees is discretionary, the court should consider the following five factors in its analysis: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980); *Todd,* 47 F.3d at 1458. "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address in applying section 502(g)." *Bowen,* 624 F.2d at 1266.

Here, the district court considered each one of these five factors. Although the district court was "hesitant to state that Standard acted in bad faith while handling Wegner's disability claim," it did note that Standard's attempt to support its benefit calculation via a Change Authorization form that was executed after Wegner became disabled "bordered on the frivolous"; according to the district court, the policy clearly stated that any change in compensation executed after a disabling injury has no effect on the calculation of benefits. Standard, taking issue with the district court's characterization of its position as somewhat frivolous, asserts that the Change Authorization form was submitted not to support its benefit calculation, but to demonstrate that: (1) Wegner's assignment to the Kern River project was temporary and (2) Wegner's base salary was $10.75 per hour at the time Standard calculated the disability benefit. We are not convinced, however, by Standard's attempt to justify its use of the Change Authorization form. We are puzzled by how this form, which was executed simply to terminate Wegner's $300 per day salary and return him to a $10.75 hourly wage, demonstrates that the $300 per day salary was temporary. As discussed above, the project could conceivably have lasted for months to a year or longer. Any attempt to translate the fortuity of Wegner's being injured so shortly after his assignment into a characterization of the compensation as being "temporary" is misguided.

9

Further, we view as disingenuous Standard's simultaneous argument that it looked to the Change Authorization form simply to demonstrate that Wegner's base salary was $10.75 per hour at the time it calculated the benefit, and not to establish a lower benefit amount. We take Standard's argument to be as follows: (1) Wegner's base salary never changed from $10.75 per hour; (2) therefore, his "monthly rate of earnings," for the purpose of calculating predisability earnings, was not affected by the post-disability Change Authorization form; and therefore (3) its use of the post-disability Change Authorization form to determine Wegner's base salary at the time it calculated the benefit was not prohibited by the policy. Although we disagree with Standard's contention that Wegner's base salary never changed upon his assignment to the Kern River project, this by itself has no bearing on our assessment of Standard's good faith in dealing with his claim. However, we note that, in making the above argument, Standard has claimed that the term "monthly rate of earnings" is a defined concept in the policy; our reading of the policy determines this not to be the case. This evidences a lack of credibility on Standard's part, and convinces us that the above argument is nothing but a post hoc attempt to justify what was an otherwise proscribed use of the Change Authorization form; in other words, a more likely scenario is that Standard was aware that Wegner's monthly rate of earnings changed after his disabling injury, and nevertheless chose to rely on this change (as evidenced in the Change Authorization form) to calculate a lower disability benefit. The district court did not err in weighing such behavior against Standard.

The district court also found that Standard had the ability to satisfy an award of fees.[14] It also determined that an award of fees would deter other insurers from acting in a similar manner when confronted with similar circumstances, and that the relative merits of the parties were evident from its grant of summary judgment in favor of Wegner.[15] After reviewing the district court's analysis of the "nuclei of concerns" that are relevant in determining if an award of fees is appropriate, we cannot

---

[14]Standard does not contest this finding.

[15]We note that the district court, finding Standard's interpretation of the term "any other extra compensation" to be reasonable, gave more credit to Standard's position than we do.

10

say that it committed an abuse of discretion in awarding attorneys' fees to Wegner.

We now examine whether the district court erred in the amount of attorneys' fees it awarded. Once the district court concludes that a party is entitled to attorneys' fees, it must utilize the lodestar method to determi ne the amount to be awarded. *Todd,* 47 F.3d at 1459. Under this method, the district court must determine the reasonable number of hours expended on the litigation[16] and the reasonable hourly rates for the participating attorneys, and then multiply the two figures together to arrive at the "lodestar." *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995); *Forbush v. J.C.Penney Co.,* 98 F.3d 817, 821 (5th Cir.1996). The lodestar is then adjusted upward or downward, depending on the circumstances of the case, after assessing the dozen factors set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717-19 (5th Cir.1974). *Kellstrom,* 50 F.3d at 329; *Forbush,* 98 F.3d at 821.[17] We review the district court's determination of reasonable hours and reasonable rates for clear error. *Kellstrom,* 50 F.3d at 324. Any lodestar adjustments are reviewed for abuse of discretion. *Id.* at 329.

Standard contends that Wegner did not submit sufficient documentation to support the amount of fees awarded. Specifically, Standard complains that the documentation lacks evidence of (1) the qualifications, skill, or reputation of four of the five participating attorneys, (2) the specific work performed by any of the attorneys, and (3) the necessary nature of such work. Further, Standard argues t hat the district court failed to adequately apply the lodestar method in the calculation of the fees.

---

[16]This calculation requires not only a determination of whether the total number of hours claimed were reasonable but also whether the particular hours claimed were reasonably expended. *Kellstrom,* 50 F.3d at 325.

[17]These factors include: (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable;" (11) the type of attorney-client relationship and whether that relationship was long-standing; and (12) awards made in similar cases. *Johnson,* 488 F.2d at 717-19.

Preliminarily, we note that the fee applicant has the burden to submit adequate documentation of the hours reasonably expended. *Kellstrom,* 50 F.3d at 324. Litigants clearly "take their chances" that the district court will reject or reduce fee awards if they submit vague or incomplete applications. *Id.* at 326-27. Here, Wegner's proffer of documentation was marginal at best, and arguably inadequate: (1) a computer printout listing the number of hours expended by and hourly rates of the attorneys who worked on the case; and (2) an affidavit from lead counsel reflecting her credentials and her view that the attorneys' fees on the printout were reasonable and necessary in the prosecution of the case.[18] We note, particularly, the absence of any time sheets or descriptions of the work done. Although Wegner's documentation was sparse, we cannot say that it was so vague or incomplete that the district court was precluded from conducting a meaningful review of whether the hours claimed on this litigation were reasonably expended. *See League of United Latin American Citizens # 4552 v. Roscoe Indep. School Dist.,* 119 F.3d 1228, 1233 (5t h Cir.1997). Other than identifying the glaring holes in Wegner's documentation (*e.g.,* the nondescriptive billing), Standard has not provided us (nor did it provide the district court) with detailed information explaining why or how the total number of hours claimed were not reasonable.[19] Under these circumstances, given the district court's familiarity with the legal work done on this relatively straightforward contract interpretation case as

---

[18]According to the printout, the total hours expended by the participating attorneys and their respective hourly rates were as follows:

| Attorney | Hours | Rate | Fee |
|---|---|---|---|
| J.G. Emerson | 14.40 | $250.00 | $ 3,600.00 |
| Bill Vidor | 2.00 | 150.00 | 300.00 |
| Teri Walter | 5.30 | 150.00 | 795.00 |
| Bruce Feichtinger | 12.50 | 150.00 | 1,875.00 |
| Terri H. Green | 118.90 | 150.00 | 17,835.00 |
| Total: | 153.10 | | $24,405.00 |

All attorneys are employed by the law firm of Whittington, Pfeiffer and Vacek.

[19]We are not swayed by Standard's attorneys' assessment, in their Reply Brief [to the district court] Regarding Attorneys' Fees, that Wegner's inadequate application "robbed [them] of the opportunity to closely examine Wegner's lawyers' activities," thus constraining their ability to provide information to the district court. Standard's attorneys' efforts on this case should have provided them with sufficient insight into the nature and scope of their adversaries' work.

well as our deferential standard of review, we are constrained to hold that the district court had sufficient information before it to determine reasonable hours.

Next, we turn to the district court's methodology in awarding the attorneys' fees in this case. Acknowledging the computer printout submitted by Wegner, the court stated as follows: "[A]fter considering the number of hours expended on this case by Wegner's attorneys, the [c]ourt finds that the claimed hours are reasonable. The [c]ourt also finds that the hourly rates sought for the various attorneys at Whittington, Pfeiffer and Vacek are reasonable. Therefore, the [c]ourt declines to adopt different hourly rates." Further, after listing the *Johnson* modification factors, the court stated: "[A]fter considering the various *Johnson* factors in the context of this case, the Court finds that neither an enhancement nor a reduction of the lodestar is warranted. Rather, the appropriate amount of attorney's [sic] fees in this case is $24,405.00—the amount billed hourly by the attorneys...." Although the district court could have spoken with more detail in its order, there is no question that it analyzed the claimed hours and rates and reviewed them against the backdrop of the twelve *Johnson* factors. "A district court's *Johnson* analysis ... need not be meticulously detailed to survive appellate review:

> If the district court has articulated and clearly applied the criteria ..., we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose."

*Forbush,* 98 F.3d at 823 (internal quotation omitted); *see also Todd,* 47 F.3d at 1459 (finding an abuse of discretion in the award of attorneys' fees when the district court *failed to apply* both the *Bowen* factors and the lodestar calculation); *Bellaire General Hospital v. Blue Cross Blue Shield of Michigan,* 97 F.3d at 833 (finding an abuse of discretion when the record contained "no discussion of the two-step analysis necessary for an award of attorneys' fees in ERISA case, or any explanation at all of how the district court arrived at the fee award"). Here, the district court set forth the *Bowen* factors, computed the lodestar calculation, and articulated and applied the *Johnson* criteria. Because we cannot say that its findings are so clearly erroneous that they represent an abuse of discretion, we affirm the award of attorneys' fees to Wegner.

13

## CONCLUSION

For the foregoing reasons, we AFFIRM summary judgment granted in favor of Wegner on the issue of the proper calculation of his disability benefit under the policy. Likewise, we AFFIRM the award of attorneys' fees of $24,405.00 in favor of Wegner.

\_\_\_\_\_ _____ _____

14