### PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY

v.

### Mary Ellen SHARPLESS, M.D.

### No. CIV.A.00–236–D–1.

United States District Court, M.D. Louisiana.

March 19, 2003.

Lauren A. Welch, McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, Metairie, LA, Mindy Brickman Patron, McGlinchey Stafford, PLLC, New Orleans, LA, for Plaintiff.

H. Alston Johnson, III, Phelps, Dunbar, LLP, Baton Rouge, LA, Amos H. Davis, Baton Rouge, LA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RIEDLINGER, United States Magistrate Judge.

Plaintiff Provident Life and Accident Insurance Company filed this declaratory judgment action against defendant Mary Ellen Sharpless, M.D.,[1] seeking to rescind the disability insurance policy it issued to the defendant and recover benefits paid pursuant to the policy since December 3, 1997. Plaintiff alleged that the defendant made fraudulent misstatements in response to questions on the policy application forms. Plaintiff sought rescission based on the fraudulent misstatement provision of the policy's incontestability clause. Plaintiff claimed that the defendant made false statements in her application with the intent to deceive in order to obtain disability coverage that would not have been provided had she given truthful answers to the questions.

Defendant denied the plaintiff's allegations and brought counterclaims against the plaintiff for bad faith breach of contract, intentional infliction of emotional distress, defamation, estoppel and laches, penalties and attorney's fees. Defendant also demanded a jury trial on all claims alleged in the action.

Shortly before trial the parties filed motions for summary judgment. Plaintiff asserted that the disability policy issued to the defendant was part of an employer sponsored insurance plan covered by the Employee Retirement Income Security

---

1. Defendant was also referred to as Mary Ellen Corry or Dr. Corry at various times and during the trial.

Act (ERISA). Ultimately, summary judgment was denied because there were genuine, material factual disputes on all issues, including the question of whether the disability insurance policy issued to the defendant was governed by ERISA.

At the trial the entire case was presented before a jury. After all of the evidence was presented on the applicability of ERISA to the policy, the court ruled that the preponderance of the credible evidence supported the conclusion that the disability policy issued to the defendant was part of an employer sponsored ERISA plan, and therefore governed by ERISA rather than state law.[2] Based on this finding and established precedents, the court ruled that the defendant had no right to a jury trial and that her state law counterclaims were preempted by federal law. After the court ruled on the ERISA question, by agreement of the parties, the case was allowed to proceed in its entirety as a jury trial, with any findings rendered by the jury treated as an advisory verdict.[3] However, the jury was unable to reach a unanimous verdict and was discharged.

As trier of fact, the court issues the following findings of fact and conclusions of law. Throughout these findings and conclusions the critical testimony and exhibits will be discussed. However, all of the evidence has been considered. Application of the relevant legal principles to the credible evidence supports the conclusion that the plaintiff is entitled to judgment in its favor, and relief in the form of rescission of the policy and return of the benefits it paid to the defendant.

### Jurisdiction

Provident is incorporated in Tennessee, and its principal place of business is also in that state. Defendant is a citizen of Louisiana. Thus, there is complete diversity of citizenship. The amount in controversy required by 28 U.S.C. § 1332 is easily met in this case exclusive of interest and costs. The policy provides benefits of $15,000.00 per month. At the time the complaint was filed the plaintiff had already paid more than $75,000.00 to the defendant.[4]

### The Disability Policy is Governed by ERISA

#### Applicable Law

 Whether the disability policy issued by the plaintiff to the defendant is governed by ERISA is a threshold legal issue. The existence of an ERISA plan necessarily depends on the existence of an employer and an employee,[5] and is a question of fact which must be decided by the court.[6] The court engages in a three part inquiry. First, the court examines the safe-harbor provisions of the U.S. Depart-

2. Record document number 131; record document number 142, trial transcript, Tr. 752–765, 766–767.

3. Tr. 765–766.

4. The disability policy number is 06–337–7053840. The policy was issued March 26, 1991, with an effective date of March 1, 1991. Joint Exhibit 7. It provided benefits of $15,000.00 a month, plus cost of living adjustments to the extent allowed by the policy. It is undisputed that the defendant has been disabled since December 3, 1997, based on the policy's definition of disability. Tr. 261, 424, 545.

5. 29 U.S.C. § 1002(1) (definition of employee welfare benefit plan); 29 U.S.C. § 1002(5) (definition of employer); 29 U.S.C. § 1002(6) (definition of employee); 29 U.S.C. § 1002(7) (definition of participant). *Meredith v. Time Ins. Co.,* 980 F.2d 352, 354 (5th Cir.1993).

6. *See, McDonald v. Provident Indemnity Life Ins. Co.,* 60 F.3d 234, 236 (5th Cir.1995), *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996); *Borst v. Chevron Corp.,* 36 F.3d 1308, 1323–24 (5th Cir.1994); *Gahn v. Allstate Ins.,* 926 F.2d 1449, 1451–52 (5th Cir.1991).

ment of Labor regulations to determine whether the program is exempt from ERISA. Under the regulations, all four of the following criteria must be met for exemption: (1) the employer does not contribute to the plan; (2) participation is voluntary; (3) the employer's role is limited to collecting premiums and remitting them to the insurer, and (4) the employer received no profit from the plan.[7] Second, the court must determine whether there is a "plan" by inquiring whether "from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." [8] Finally, the court asks whether the employer established or maintained the plan for the purpose of providing benefits to its employees.[9] In determining whether an ERISA plan exists, the court must focus on the employer and its involvement with the plan.[10]

## Findings and Conclusions

■ Based on the findings and reasons explained at trial and the following findings, the court concludes that the disability policy issued to the defendant by the plaintiff is governed by ERISA. The uncontra-

dicted evidence establishes that the defendant became an employee of Anesthesia Specialists of Baton Rouge (ASBR), a professional medical corporation, as an anesthesiologist on August 1, 1988.[11] On March 1, 1991, the defendant was given shareholder status and continued her employment relationship with ASBR by entering into an employment contract with the corporation.[12] The evidence also establishes that ASBR provided disability insurance benefits for all employees, including shareholder employees,[13] through a group policy paid for by the corporation and individual policies which could only be obtained by shareholders.[14] Once a doctor became a shareholder, in addition to the group policy, one of the benefits provided by the corporation was the opportunity to apply for an another disability policy.[15] Defendant chose to apply to Provident for this additional individual policy. Therefore, at the time she became a shareholder the defendant was covered under a group disability policy with a monthly benefit of $5,000.00 which the company had provided since she became an employee in 1988, as well as the March 1, 1991, policy issued by Provident with benefits of $15,000.00 per month.[16]

7. *Gahn,* 926 F.2d at 1453 (all four criteria must be met for a plan to be exempt from ERISA).

8. *McDonald,* 60 F.3d at 236, *citing, Memorial Hospital System v. Northbrook Life Ins. Co.,* 904 F.2d 236, 240 (5th Cir.1990). A formal document designated as "the Plan" is not required to establish the existence of an ERISA plan. *Memorial Hospital,* 904 F.2d at 241.

9. *Id.*

10. *McDonald,* 60 F.3d at 236.

11. Tr. 107, 118, 134.

12. Joint exhibit 1; Tr. 136, 137.

13. Throughout the trial this group policy was referred to as the "Fortis" policy. Plaintiff's

exhibit 70, page 00206, Fortis Benefits, Policy No. 38213. On the Provident application forms and data sheets it appears as other coverage not to be replaced, with the amount and carrier listed as $5,000.00, "Mutual Benefit."

14. Joint exhibit 4; Tr. 53–59, 107–110, 120, 135, 136.

15. Tr. 56, 72–74, 112, 123.

16. The trial testimony as well as the minutes of the shareholder doctor's meeting on January 21, 1991, established that the doctors all voted to increase their disability coverage to this amount. Two of the doctors wanted a higher monthly benefit of $21,000.00. Joint exhibit 2. Tr. 112–114.

The premiums for the individual policies were not deducted from the doctors' pay checks and forwarded to the plaintiff. Instead, the corporation paid the total monthly premiums out of the company account each month for all the doctors.[17] This is consistent with the fact that shareholder doctors who applied for the Provident policy stated on question number 11(a) of the application that the employer would be paying the premiums.[18] This is also consistent with the uncontradicted evidence that two doctors who wanted coverage above the level of the other doctors paid for the additional coverage themselves. Georgene Jones, the ASBR office manager, arranged loans from the company to pay the additional premiums. The loan amount was later withheld from these doctors' pay checks.[19] And contrary to the negative response to the second part of question number 11(a), the evidence introduced at trial established that the corporation in fact added the amount of the premiums paid to the doctors' W–2 forms as salary. The purpose for doing this was so that if the doctors ever collected benefits they could receive them tax free.[20]

The uncontradicted testimony of the plaintiff's chief underwriter, Frank Hall, established that each of the doctors' affirmative response to question 11(a) qualified the doctors to receive a higher benefit, even though in fact the corporation was adding the amount of the premiums to their taxable income. Had the responses to the question shown what actually occurred, i.e., the premiums were included as part of the doctors' taxable income, the doctors who obtained the policy would not have qualified for $15,000.00 in coverage, but a lower benefit amount.[21]

The corporation handled all the administrative details which carried out the plan for the doctors to receive an increased tax free benefit. The payment of premiums, communications with the insurer, and bookkeeping tasks related to the individual policies, as well as other matters related to administering the policies, were all handled by Jones, the corporation's office manager.[22]

The vague and confusing testimony from the defendant, Jones, Dr. Mark Walker, and Dr. Fahimeh Tahvildari that the shareholder doctors somehow actually paid the premiums from their "even-up account"[23] is not credible. Although the policies were applied for and issued to the individual doctors, it is clear that both the plaintiff and ASBR administered the policies as a group, with ASBR drafting the total amount of the monthly premiums from its corporate account, and the plaintiff giving the doctors a ten percent group discount because of the number of policies and the fact that ASBR was sponsoring the plan.[24] The policy data sheet and home office form reflected this discount, and the home office form listed ASBR as the risk name.[25]

Thus, a preponderance of the credible evidence establishes the following findings

---

**17.** Tr. 114–118, 122, 127.

**18.** Joint exhibits 4 and 73; Plaintiff's exhibit 70, page 00204; Tr. 238.

**19.** Joint exhibits 2 and 3; Tr. 68–70, 113, 114. Jones was a non-shareholder employee of the corporation. Tr. 107–108.

**20.** Joint exhibit 3; Tr. pp. 114, 115, 145.

**21.** Joint exhibit 9; Tr. 238–240.

**22.** Joint exhibits 2, 3, 9, 22–1 through 22–4; Plaintiff's exhibit 70, pages 00204–00207, 00389, 00436, 00461, 00462, 00464; Tr. 107–118, 708.

**23.** Tr. 54–56, 62–70, 77–81, 128–133, 691, 692, 704, 705, 707, 708, 713–716.

**24.** Joint exhibits 9 and 73; Tr. 232–40.

**25.** Joint exhibits 9, 22–1 and 73.

of fact and conclusions of law. Defendant's employer, ASBR, paid either all or part of the premiums for its employees' disability policies, including the Provident policies, and its role was not merely limited to collecting premiums and sending them to the insurer. Therefore, the program of disability benefits provided by ASBR to its employees was not exempt from ERISA under the safe-harbor provisions. A plan also clearly existed, i.e., the benefits and the procedures for obtaining benefits were described in the disability policies, and ASBR was the source of financing for the plan for the benefit of all of its employees. Focusing on the employer and its involvement with the plan, it is evident that ASBR performed the administrative duties necessary to establish and maintain the disability benefits plan.

Defendant's employer established and maintained a disability insurance program, consisting of the group policy and the individual Provident policies, for the purpose of providing benefits to its employees. Although the defendant became a shareholder in March 1991, she continued her employment relationship with ASBR by virtue of an employment contract and by its terms was an employee of the corporation. Therefore, the defendant was an employee and participant in this employee benefit plan.[26] Since the disability policy issued by the plaintiff to the defendant in March 1991 was a part of the plan established by ASBR, it is governed by ERISA.

■ The resolution of several other legal issues in this case turns on this finding. As the court ruled at trial, the defendant's state law counterclaims of bad faith breach of contract, negligent infliction of emotional distress, estoppel, defamation and penalties and attorney's fees are preempted.[27] Finally, because the policy is an ERISA policy and the claims for rescission and restitution are equitable in nature, the defendant is not entitled to a trial by jury.[28]

### Plaintiff Proved Fraudulent Misstatements in the Application

### Applicable Law

Defendant argued that the policy provision under the heading "CONFORMITY WITH STATE STATUTES" requires application of LSA 22:619 to the facts of this case.[29] Since the policy is governed by ERISA, the Fifth Circuit's holding in *Tingle v. Pacific Mutual Ins. Co.*, 996 F.2d 105, 108 (5th Cir.1993), mandates a finding

**26.** *See, McNeil v. Time Ins. Co.*, 205 F.3d 179, 190, n. 17 (5th Cir.2000) (plan including partner and one employee was employee welfare benefit plan); *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 291 (5th Cir.1999) (plan covering owners and employees constitutes ERISA plan). Defendant does not fall within the Fifth Circuit's holdings in *Robertson v. Alexander Grant Co.*, 798 F.2d 868 (5th Cir.1986), *cert. denied*, 479 U.S. 1089, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987) (partners outside scope of ERISA's definition of employees), or *Meredith, supra*, (plan purchased by sole proprietor and spouse was not employee benefit plan because they were not employees within ERISA definitions).

**27.** ERISA's provisions supersede any and all state laws as they may relate to any employee benefit plan. 29 U.S.C. § 1144(a). *See, Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987); *Degan v. Ford Motor Co.*, 869 F.2d 889, 893 (5th Cir.1989); *Light v. Blue Cross*, 790 F.2d 1247, 1248 (5th Cir.1986); *Lee v. Sun Life*, 20 F.Supp.2d 983 (M.D.La.1998).

**28.** *McDonald*, 60 F.3d at 238; *Borst*, 36 F.3d at 1323–24, *citing, Calamia v. Spivey*, 632 F.2d 1235, 1237 (5th Cir.1980).

**29.** The conformity provision stated: "Any provision of this policy which, on its effective date, is in conflict with the laws of the state in which you reside on that date is changed to conform to the minimum requirements of those laws."

that this state statute is preempted. It is also clear under Fifth Circuit precedent that ERISA preempts state law governing insurance policy interpretation.[30]

■ Congress expected that a federal common law of rights and obligations under ERISA-regulated plans would develop. *Todd v. AIG Life Ins.*, 47 F.3d 1448, 1452–53 (5th Cir.1995); *Jones v. Georgia Pacific Corp.*, 90 F.3d 114, 116 (5th Cir.1996). Therefore, federal common law governs this case, including the interpretation of the policy provisions at issue. *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir.1997). The court may draw guidance from analogous state law in ascertaining the applicable federal common law, but in doing so, may use it only to the extent that it is not inconsistent with congressional policy concerns. *Id.* In construing ERISA plan provisions, the court interprets the contract language in an ordinary and popular sense as would a person of average intelligence and experience. The words of insurance contracts should be given their ordinary and generally accepted meaning if there is one. *Id.,citing, Todd,* 47 F.3d at 1451 n. 1. Only if the terms remain ambiguous after applying ordinary principles of contract interpretation is the court compelled to apply the rule of contra proferentum and construe the terms strictly in favor of the insured. *Todd,* 47 F.3d at 1451–52. Thus, application of the principles of contract interpretation of the terms of an ERISA policy or plan require the court to apply the plain language of the policy.

·The Provident policy provides that after two years from the effective date of the policy, no misstatements, except fraudulent misstatements, made by the insured in the policy application, can be used to void the policy or deny a disability claim that starts after the end of the two year period.[31] This provision requires the plaintiff to prove a fraudulent misstatement in order to obtain the relief it seeks. It is well-established that an incontestability clause may expressly except from its operation actual fraud committed by the insured in procuring the insurance.[32] The phrase "fraudulent misstatement" requires the insurer to prove an intention to defraud.[33] Plaintiff's chief underwriter, Hall, testified at trial that the terms of the policy required proof of fraud.[34] This testimony is consistent with the clear and unambiguous terms of the policy.

Plaintiff's arguments to the contrary based on the district court's decision in *Tingle v. Pacific Mutual Ins. Co.*[35] and other precedents are unpersuasive. As conceded by the plaintiff, none of these cases dealt with an incontestability clause with language like the one contained in this policy. The cases simply addressed the legal standard for voiding an ERISA-

---

**30.** *Thibodeaux v. Continental Casualty Ins. Co.,* 138 F.3d 593, 595 (5th Cir.1998).

**31.** TIME LIMIT ON CERTAIN DEFENSES

1. After two years from the Effective Date of this policy, no misstatements, except fraudulent misstatements, made by you in the application for this policy will be used to void the policy or to deny a claim for loss incurred or disability that starts after the end of such two year period.
2. No claim for loss incurred or disability that starts after two years from the Effective Date of this policy will be reduced or denied on the ground that a sickness or physical condition not excluded by name or specific description had existed before the Effective Date of this policy.

It is undisputed that the plaintiff seeks to rescind the policy more than two years after the effective date of the policy.

**32.** 17 Couch on Insurance 3d, § 240:64.

**33.** *Id.*

**34.** Tr. 231, 284–286.

**35.** 837 F.Supp. 191, 193 (W.D.La.1993).

governed policy based on misstatements in the application, in the absence of any specific policy language or provision. In light of the clear policy language here and the federal common law principles governing contract interpretation as cited above, these cases are not controlling or persuasive and cannot be used as authority to apply a standard contrary to the terms of the policy. Simply put, use of the standard advocated by the plaintiff would effectively abrogate the policy language.[36]

■ Therefore, in order to rescind the disability policy issued to the defendant, the plaintiff must do so under the incontestability clause and establish that the defendant made a fraudulent misstatement in the application. Plaintiff has the burden of proving: (1) that the defendant made a false statement(s); (2) that the statement(s) was material; (3) that the defendant knew the statement was false at the time it was made, or that it was made recklessly without any knowledge of its truth, and (5) the false statement was made with the intent to deceive. *Massachusetts Casualty Ins. Co. v. Reynolds*, 113 F.3d 1450, 1455–56 (6th Cir.1997).

## Findings and Conclusions

Plaintiff maintained that the defendant made false and material misstatements with an intent to deceive in her responses to question numbers 5(a) and 7 in the application dated February 7, 1991, and in response to question numbers 2(b), 6 and 7 in the application dated February 14, 1991.[37] Under the terms of the policy the application was incorporated as a part of the policy.[38] The application form asked the defendant to respond to the following questions:

From the application form dated February 7, 1991: [39]

Question number 5(a): "Have you ever been treated for or ever had any known indication of: (a) High blood pressure, diabetes, cancer, arthritis, asthma, emphysema, or emotional, nervous or mental disorder, or disease or disorder of the eyes, ears or speech?"

Question number 7: "Have you ever used barbiturates, narcotics, excitants or hallucinogens, or ever sought help or treatment for their use or alcohol use?"

From the application form dated February 14, 1991: [40]

Question number 2(b): "Have you ever been treated for or ever had any known indication of: b. Dizziness, fainting, convulsions, headache, speech defect, paralysis or stroke; mental or nervous disorder?"

Question number 6: "Have you ever used barbiturates, narcotics, excitants or hallucinogens or ever sought treatment or been arrested for their use?"

Question number 7: "Have you ever sought help or treatment for alcohol use?"

After the entire list of questions and above the defendant's signature, the Feb-

---

**36.** In its post-trial memorandum, the plaintiff concedes that the "knowledge and belief" language contained in the application form requires the defendant's statements to be assessed in light of her actual knowledge and belief. Record document number 139, pp. 10–13.

**37.** It is undisputed that the defendant provided the responses to the application questions, reviewed, and signed the applications. Plaintiff's exhibit 70, pages 00183; Tr. 148, 149.

**38.** Joint exhibit 7, policy, p. 1 stated: "This policy is a legal contract between you and us. It is issued in consideration of the payment in advance of the required premium and of your statements and representations in the application. A copy of your application is attached and made a part of the policy."

**39.** Joint exhibit 4.

**40.** Joint exhibit 5.

ruary 7 form also contained the following statement:

"To the best of my knowledge and belief, all of the foregoing statements and all of those in Part II, if any, of this Application are true, complete, and correctly stated. They are offered to Provident Life and Accident Insurance Company as the basis for any insurance issued on this Application."

Defendant responded "no" to all of these questions. Question number 7 on both the February 7 and February 14 application forms unambiguously asked the defendant if she had ever sought help or treatment for alcohol use. Plaintiff maintained that the defendant gave false answers to these inquiries.

Plaintiff relied on the contents of the defendant's medical records from September 1992 to 1999, in which the defendant reported that she had sought help for alcohol use in January 1991. Defendant, however, testified that when she related this history, it was an incorrect approximation of the beginning of her treatment with substance abuse counselor Phil Breeden.[41] Defendant testified that the event which prompted her to make an appointment with Breeden was when she became intoxicated at a Super Bowl party, and a few days later her husband requested that she get an evaluation. Defendant stated that she did not act on her husband's request right away because she did not believe that she had a problem with alcohol. According to the defendant, after the suit was filed she remembered that she saw Breeden just before Breeden's first child was born, which was after she completed the application on February 14.[42]

Accepting defendant's contention that she saw Breeden for a consultation regarding her alcohol use sometime after January 27, the date of the Super Bowl, but before March 6, the date Breeden's child was born, the preponderance of the credible evidence establishes that the consultation with Breeden occurred some time in late January 1991. This was the time related by the defendant to the persons treating her in September 1992 and thereafter. It was only after suit was filed that the defendant stated that she must have seen Breeden some time after she completed the application, but before March 6.[43] Defendant acknowledged making the statements about seeing Breeden over concern about her alcohol use in January 1991 to Susanne Jensen and Dr. Paul Ware upon admission to Charter Forest Hospital,[44] and also on entering treatment at the Menninger Clinic in late December 1997.

This January 1991 time was invariably reported by the defendant throughout her treatment beginning in September 1992, as well as to Provident in July 1998.[45] Defen-

---

41. Record document number 138, p. 6; Tr. 163. Breeden did not retain his treatment records after five years. Thus, the date of the initial consultation was unavailable. Plaintiff's exhibit 70, pages 00406–00409.

42. Tr. 189–200.

43. Tr. 161, 189–193.

44. Jensen was the defendant's treating psychologist from September 11, 1992, until December of 1997. Tr. 536, 540, 552, 553. Dr. Ware was the defendant's treating psychiatrist from September 14, 1992, until early 1998. Tr. 360, 363, 371, 390.

45. See, for example: Joint exhibit 12, first page of Jensen's records; Joint exhibit 16, p. 45; Joint exhibit 18, pages 00111, 00112, 00115; Joint exhibit 14, first page of notes of Owen Scott; Plaintiff's exhibit 70, 00112, 00119, 00396, 00554, 00559, 00563; Tr. (Dr. Ware) 394–403, 411; Tr. (Jensen) 550; Tr. (Corry) 150–164, 227–229; Tr. (Porter) 470–473, Tr. (Dr. Barbee) 628. The records and testimony showed that the defendant consistently reported her consultation with Breeden took place in January 1991. A few references in the records state that the defendant reported drinking heavily after the birth of her daughter, and sought help a year later. Such

dant did not dispute that the doctors and other health care providers accurately recorded what she told them about when and why she went to see Breeden. The conclusion that the records are more accurate than the defendant's later recollection is also supported by Owen Scott's trial testimony that he found the information given to him by the defendant during treatment was consistently accurate with respect to prior records.[46] Considering the consistency of all of this evidence, the defendant's later testimony is simply not credible.

Because the defendant's first visit with Breeden occurred in January 1991, this appointment and the events leading up to it necessarily preceded her completing the application forms on February 7 and 14.[47] Both question number 7 on the February 7 form and question number 7 on the February 14 form clearly asked the defendant if she had "ever sought help or treatment for alcohol use." Thus, the defendant's response to these questions addressing alcohol use by checking "no" was false.

■ Significantly, the medical records beginning in 1992 also consistently included self-reports by the defendant to her health care providers that she had feelings of depression since adolescence, at the age of 17 was admitted to the hospital for treatment due to an overdose of barbiturates, and had seen a psychiatrist in 1984 during her first marriage. There is no dispute that these events occurred and that the defendant reported all of these facts to her mental health care professionals in the course of treatment.[48] Thus, the preponderance of the credible evidence supports the conclusion that in February 1991, the defendant was aware of these events. Simply put, if the defendant had the knowledge and awareness to report these facts in September 1992 and thereafter, at times when she was under great stress, then she would have been able to do so in February 1991.[49] The application questions unambiguously asked whether the defendant had ever sought help or treatment for alcohol use, ever used barbiturates, or been treated for or had any known indication of a mental, nervous or emotional disorder. With knowledge of these events, a person of average intelligence and experience would have answered these questions in the affirmative rather than the negative.

Even if the court accepted the defendant's argument that the question asking

---

statements would also coincide with a January 1991 time frame, because the daughter's birth occurred in December 1989. Plaintiff's exhibit 70, page 00214. All the records essentially state in one way or another that the purpose of going to see Breeden was to seek evaluation and counseling because of concern about alcohol abuse.

The statements in the medical records contradicted defendant's testimony that she hesitated or was in denial at the time her husband requested she see someone for an evaluation of her use of alcohol. See, for example, Joint exhibit 18, page 00109, 00112, 00115.

**46.** Tr. 836–837.

**47.** It is unnecessary to determine the exact date in January. Based on the determination that the defendant saw Breeden for an evalua-

tion concerning her alcohol use before she completed the applications for the Provident policy, it is also unnecessary to determine whether the defendant had a continuing duty to disclose information responsive to the questions between the time she completed the application and the date the policy was issued.

**48.** See, for example, Joint exhibit 10; Joint exhibit 12, pages 1, 81, 83, 92; Joint exhibit 13, pages 00248, 00249, 00256, 00258, 00259; Joint exhibit 14, pages 98, 106, 117; Joint exhibit 16, page 45; Joint exhibit 18, pages 00109, 00195; Joint exhibit 19, page 36; Plaintiff's exhibit 70, pages 00249, 00396, 00430, 00438; 00553; Tr. 166–171, 416–419, 548–550, 624.

**49.** Tr. 371–375.

whether she had ever "used barbiturates" was ambiguous and did not clearly include one incident of an overdose of sleeping pills, a person of average intelligence and experience would have known that such an incident, episodes of depression, as well as seeing a psychiatrist, are known indications of an emotional, mental or nervous disorder or disease.

Defendant argued that the application questions were ambiguous and that she did not answer them falsely because she did not believe she had an alcohol or drug problem, and had never been diagnosed as an alcoholic or suffering from any emotional, nervous and mental disorder. These arguments are unpersuasive. The questions did not ask if the defendant believed she had a problem related to any of these conditions or whether she had ever been diagnosed with a mental disorder or alcoholism. They plainly asked for information related to use of barbiturates and treatment for barbiturate or alcohol use, and any known indications of or treatment for emotional, mental or nervous disorders. Given these clear questions and the defendant's knowledge of her own past medical history, her responses were false.

However, the court finds that the defendant's failure to answer "yes" and provide information about past marijuana use was not a knowingly false statement. The questions did not specifically list marijuana, and based on the evidence introduced regarding the medical classification of marijuana,[50] it is not clear than any of the other substances listed included marijuana. Plaintiff's own underwriting guidelines did not describe or categorize marijuana under any of the names listed in questions 6 and 7 of the application forms.[51] Since none of the questions unambiguously requested information about marijuana, the court cannot find that the defendant knowingly answered these questions falsely based on any past marijuana use. Under the rule of *contra proferentum* this ambiguity must be resolved in the defendant's favor.

At the time the defendant completed the form she knew she had seen Breeden for her alcohol use. As she reported to her doctor and therapist in 1992, she knew she had seen a psychiatrist during her first marriage, had incidents of depression, and used barbiturates in a suicide attempt at the age of 17. The records did not indicate that the defendant had any problems remembering or that any events had been suppressed.[52] Just because none of her family ever talked about the overdose, and the defendant was not given mental health treatment afterward, does not mean that the only reasonable inference is that she forgot about it. Defendant's medical records from 1992 forward refute such a conclusion.

Thus, a preponderance of the credible evidence establishes that the defendant's false answers to the application questions were knowingly made, and with the intent to deceive and mislead the plaintiff into

---

50. Tr. 800–801. The application listed four categories: barbiturates, excitants, narcotics and hallucinogens.

51. Joint exhibit 6, Drugs–5 and Drugs–6.

52. In a letter dated March 13, 1998, Dr. Jensen summarized the defendant's history and her treatment. Dr. Jensen reported that at the age of 17 the defendant made "a serious suicide attempt by overdosing," and that when the defendant awoke she "asked for psychiatric help," but her mother responded that the family would not talk about the incident again. Plaintiff's exhibit 70, page 00248. This shows that the defendant related the overdose to her treating therapist as a serious suicide attempt, and that at the time she was aware of her actions as an indication of a mental or emotional problem warranting psychiatric help.

When the defendant began to recall childhood abuse during treatment, this was reflected in the medical records. See, for example, Joint exhibit 12, p. 1.

issuing the policy. Defendant argued that no such intent can be inferred because at the time she applied for the policy she was young and had a high-paying job, a good marriage and a new baby. According to the defendant she was not really concerned about whether she got the policy, did not think she really needed the policy, the policy was expensive, and she was persuaded by the other more experienced doctors to apply for it.[53] This testimony is not credible. Defendant was already covered by another disability policy with a benefit of $5,000.00 a month. If the defendant actually did not think she needed another disability policy and that it was too expensive, she would have relied on the policy she already had and declined to apply for the additional coverage.[54] Yet, the defendant chose to apply for the plaintiff's disability policy which provided greater benefits. The most reasonable inference from these undisputed facts is that the defendant wanted the coverage provided by the policy. Defendant's negative response, despite the clear questions and her knowledge of her past medical history, establishes that she did not want to reveal any of this relevant history and risk this history being further investigated and coverage refused. Although a reluctance to reveal unflattering information in response to these questions is understandable, this does not make the defendant's answers any less inaccurate and untruthful.[55]

Defendant's other premise is also not supported by the evidence. Defendant asserted that it cannot be reasonably inferred that she knowingly made false statements with an intent to deceive because she either forgot or suppressed these events, or was in a psychological state of denial. Defendant's argument is not persuasive, given the defendant's own testimony and the medical records closer to the time of the application.

Defendant testified that at the time she filled out the application for the policy, she was happily married with a new baby and a great job.[56] In September 1992 the defendant was under such mental and emotional distress she sought treatment from Jensen and Dr. Ware and was admitted for inpatient mental health treatment at Charter Forest Hospital. Thus, during a time of great stress the defendant was able to relate this history and these events, and the medical records and reports did not reveal that the defendant had any difficulty remembering them. If the defendant had no problem recounting this information in 1992, the most reasonable inference is that she was not in such a mental or emotional state in 1991 that she could not accurately answer the questions on the application.

The testimony of Dr. Ware, the plaintiff's treating psychiatrist from 1992 until early 1998, also supports this conclusion. Dr. Ware testified that there was no condition that the defendant suffered from prior to 1997 that would have prevented her from giving truthful responses to the questions.[57] The contrary testimony by Owen Scott, the defendant's current treating psychologist, deserves less weight. Scott

---

**53.** Tr. 139–143.

**54.** The evidence shows that the defendant was aware of this policy at the time she decided to apply for the additional individual policy with Provident. Joint exhibit 4, question number 4(a); Tr. 142, 143.

**55.** The conclusions regarding the defendant's credibility, knowledge and intent are also supported by the defendant's testimony that she answered question 11(a) of the February 7 application contrary to her understanding and belief that she would be paying for the policy. Tr. 143–145, 149.

**56.** Tr. 139–143.

**57.** Tr. 414–416.

was obviously biased. His demeanor during his testimony showed that he assumed the role of an advocate for the defendant, rather than providing objective testimony and opinions regarding the defendant's mental condition and relating it to the issues in this case.[58] Moreover, Scott's opinions are far removed in time from the dates the application forms for the policy were completed.[59] The evidence established that the defendant's mental health condition and level of functioning from 1998 to the present is not the same as it was in February 1991.[60] Scott did not satisfactorily explain any reliable methodology he used to form any opinion that the defendant's current diagnosis and levels of functioning were the same or similar in 1991, and affected her ability to provide accurate and truthful answers on the application.[61] Considering all this evidence, defendant's testimony that she did not know her responses on the application would be used by the insurance company to make a decision is also not credible.[62]

█ Finally, a preponderance of the credible evidence establishes that the defendant's fraudulent misstatements were material. By the time Provident began to investigate the defendant's claim, only the hospital records from the 1974 overdose were available.[63] However, based on the information consistently reported by the defendant to the individuals treating her from 1992 to 1998, it is reasonable to infer that had the defendant truthfully answered the application questions at issue, the medical records that could have been obtained in early 1991 would have revealed relevant information about the defendant's problems with alcohol and drug use and with depression.[64]

Hall testified that the totality of the information concealed by the defendant's negative responses would have led him to decline coverage. Hall also stated that if an individual has started counseling or therapy for alcohol use at the time of an application, he would not issue the individual a policy.[65] Hall explained that the combination of consulting Breeden concerning her alcohol use, with the barbiturate overdose, and history of depression, would also have led to this decision.[66] Hall's testimony is consistent with the plaintiff's underwriting guidelines. The guidelines provided factors and guideposts for the underwriter to consider. Generally, they did not give precise formulas for limiting or denying coverage.[67] The sec-

---

58. Tr. 803–812, 816–823.

59. Scott began treating the defendant in September 1999. Joint exhibit 14.

60. For example, Dr. Ware testified that the defendant's conditions were progressive in nature. Defendant functioned successfully for years in her life and work until difficulties in relationships and with alcohol/drug use, and other stressful events, brought her to the point where she could not function and work, or accurately interpret reality. Tr. 380–386, 414–416.

61. See, for example, Tr. 798, 799, 824, 825.

62. Tr. 176–179.

63. Joint exhibit 10.

64. Tr. 241, 242.

65. Tr. 249–250, 259.

66. Tr. 232, 242–244, 247–260, 267–281, 291–297, 299–301. The finding that application questions 7 and 6 were ambiguous in regard to eliciting information about marijuana use does not undermine Hall's testimony on the question of materiality. Hall stated that consideration of past marijuana use was part of the underwriting decision, and explained that beginning therapy for alcohol problems, or this factor in combination with the history of a suicide attempt and depression, would have resulted in a decision not to issue the defendant a policy. Tr. 249, 258–260.

67. Joint exhibit 6.

tions on drug and alcohol use and mental impairments take into account relevant information in all three areas, rather than looking at any one thing in isolation. Thus, the guidelines called for consideration of factors in all of these areas to assist the underwriter in exercising his or her judgment.

### Summary of Conclusions

The court concludes that the plaintiff has proven by a preponderance of the credible evidence that the defendant made fraudulent, material misstatements on her application for the March 1, 1991, disability policy issued by Provident. Therefore, Provident is entitled to void the policy and recover the benefits paid under the policy since December 3, 1997, less the total amount of premiums paid for the policy.[68] Judgment will be entered accordingly, in favor of plaintiff Provident Life and Accident Insurance Company and against defendant Mary Ellen Sharpless.[69]

Within 20 days, the plaintiff shall submit a proposed judgment which includes the amount of disability benefits paid from December 3, 1997, to the present, with a credit for the total amount of premiums paid for the policy.

---

**68.** Voiding the policy from its inception, and return of the benefits paid subject to a credit for the total amount of premiums paid, is the relief requested by Provident in its complaint and post-trial memorandum.

**69.** After trial, Provident filed a motion pursuant to Rule 50(b), Fed.R.Civ.P. It is apparent that this motion was filed in the alternative to preserve the plaintiff's rights in the event the finding that ERISA governed the disability policy was reversed by this court or the appellate court. Because the court's ruling during the trial on the ERISA question has been maintained, the premise on which the motion is based is not present and it is unnecessary for the court to rule on this motion.